**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LYON FINANCIAL SERVICES, INC. d/b/a** | ) | |
| **US BANCORP BUSINESS EQUIPMENT** | ) | |
| **FINANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 10 C 7064** |
| | ) | |
| **ILLINOIS PAPER AND COPIER** | ) | **Judge Rebecca R. Pallmeyer** |
| **COMPANY and THE VILLAGE OF** | ) | |
| **BENSENVILLE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

When the Village of Bensenville needed to replace its copier equipment in 2008, Village

officials met with Illinois Paper and Copier Company ("Illinois Paper"), an Illinois company in the

business of providing copy machines and other office equipment. To finance their deal, the

parties turned to Lyon Financial Services ("Lyon Financial" or "Lyon"), which had provided the

Village with financing for the copier equipment that the Village now sought to replace.[1] Lyon

purchased the new equipment from Illinois Paper for more than $500,000 and provided it to the

Village under an agreement that called for the Village to make monthly payments of $9,500 to

Lyon for six years. Two years later, however, the Village pronounced the agreement

unenforceable and refused to make any further monthly payments. Lyon Financial, which had

paid for the equipment and was left holding the bag when the Village stopped making payments,

did not initially challenge the Village's assertion that the agreement was unenforceable.

---

[1] Lyon Financial, a Minnesota corporation headquartered in Marshall, Minnesota, is a financial services firm specializing in business-equipment financing. Lyon is a subsidiary of U.S. Bancorp and does business as U.S. Bancorp Business Equipment Finance Group. By virtue of a corporate merger effective January 1, 2012, U.S. Bank is the successor in interest to U.S. Bancorp Equipment Finance, Inc., which, by virtue of a separate corporate merger dated January 1, 2011, was the successor in interest to Lyon Financial Services, Inc. d/b/a U.S. Bancorp Business Equipment Finance Group. (Am. Compl. [114] ¶ 1.) Following the parties' lead, this court refers to Lyon and its successors as "Lyon" throughout.

Instead, Lyon brought a lawsuit against Illinois Paper, alleging that Illinois Paper had warranted that the deal with the Village was enforceable and that Illinois Paper is liable for breach of that warranty. The enforceability of Illinois Paper's warranty was the subject of an earlier ruling from this court, a Seventh Circuit appeal, and a question certified to the Supreme Court of Minnesota.[2] On remand from the Seventh Circuit, Lyon amended its complaint, naming the Village as a defendant and challenging the Village's assertion that the agreement is unenforceable. Lyon now seeks summary judgment against Illinois Paper on the claim of breach of warranty or, in the alternative, against the Village for breach of contract. Illinois Paper and the Village seek summary judgment, as well.

The court's jurisdiction here is secure under 28 U.S.C. § 1332. Plaintiff U.S. Bank, the successor in interest to Lyon Financial, is chartered in the state of Ohio and has its principal place of business in Minneapolis, Minnesota. (Am. Compl. ¶ 1.) Defendant Illinois Paper is incorporated in Delaware and has its principal place of business in Bolingbrook, Illinois, and thus is a citizen of Delaware and Illinois. (*Id.* ¶ 2.) The Village of Bensenville is a citizen of Illinois. The amount in controversy exceeds $500,000.

For the reasons explained below, all three motions for summary judgment are denied.

## BACKGROUND

### I. Facts

The parties have filed Local Rule 56.1 statements of undisputed material facts and statements in opposition to one another's LR 56.1 statements. To the extent the parties disagree with one another's factual contentions, these disputes are noted below.

---

[2]      *See Lyon Fin. Servs., Inc. v. Ill. Paper and Copier Co.*, No. 10-cv-7064, 2011 WL 1740132 (N.D. Ill. May 4, 2011); *Lyon Fin. Servs., Inc. v. Ill. Paper and Copier Co.*, 10-cv-7064, 2012 WL 401493 (N.D. Ill. Feb. 6, 2012); *Lyon Fin. Servs., Inc. v. Ill. Paper and Copier Co.*, 732 F.3d 755 (7th Cir. 2013); *Lyon Fin. Servs., Inc. v. Ill. Paper and Copier Co.*, 848 N.W.2d 539 (Minn. 2014); *Lyon Fin. Servs., Inc. v. Ill. Paper and Copier Co.*, No. 12-2210, 577 Fed. Appx. 606 (Mem) (7th Cir. 2014).

## A. Predecessor COTG Lease

The relationship between Lyon and the Village of Bensenville pre-dates Illinois Paper's involvement in this dispute. In June 2006, Lyon and the Village entered into an agreement with the Chicago Office Technology Group (the "COTG Lease Agreement") for the lease of certain copy equipment for use by the Village.[3] (Lyon's L.R. 56.1(a)(3) Statement of Facts [146] ("Lyon SUF") ¶ 6.) To carry out that transaction, Lyon purchased copier equipment from Chicago Office Technology Group, which was named as the "supplier" under the COTG Lease, and provided that equipment to the Village. (*Id.*) The term of the COTG Lease was 60 months, or five years. (COTG Lease, Ex. 1 to Illinois Paper's Response to Lyon's And Bensenville's L.R. 56.1(a)(3) Statement of Facts [176] ("Ill. Paper Resp. to Lyon and Village SUF").) A few months later, in December 2006, Lyon and the Village entered into a Lease Supplement (the "COTG Lease Supplement") for a paper-folding machine, also supplied by COTG. (Lyon SUF ¶ 7.) Together, the GOTC Lease and Lease Supplement required the Village to make monthly payments to Lyon in the amount of $7,125. (*Id.*)

Just two years later, in 2008, the Village decided to replace the COTG copier equipment with new copier equipment from Illinois Paper. At the time, the Village still owed Lyon an outstanding balance of more than $148,200 under the COTG Lease Agreement. (Ill. Paper L.R. 56.1(a)(3) Statement of Facts [143] ("Ill. Paper SUF") ¶ 9.) Illinois Paper agreed to supply the Village with 39 pieces of new copier equipment; as before, Lyon would finance the transaction. (Lyon SUF ¶¶ 8, 11; ILPCC Lease Agreement at 5-6, Ex. 2 to Lyon SUF.) As part of the transaction, Illinois Paper agreed to pay off the Village's remaining $148,200 obligation under

---

[3]     Illinois Paper disputes that the agreement with Chicago Office Technology Group was a true lease, but the nature of that earlier agreement is not material to the case before this court. Lease is the label given to it by the parties to that agreement. The court adopts that label, as well, recognizing that the title is not dispositive of the issue.

the COTG Lease.[4]  (Certification of Edward Bowser, Network Administrator for the Village of Bensenville, Ex. 4 to Ill. Paper Resp. to Lyon and Village SUF; Ill. Paper SUF ¶ 10.)

### B.  Terms of the Parties' Agreements

Lyon had not previously done business with Illinois Paper, and it ordinarily requires any new vendor whose goods it finances to agree to certain terms.  (Lyon SUF ¶ 9.)  Consequently, Illinois Paper and Lyon entered into an Office Equipment Finance Services Partnership Agreement (the "Partnership Agreement"), giving Lyon a first right to finance all of Illinois Paper's transactions with customers interested in lease financing for 90 days beginning on October 1, 2008.  (*Id.*)  In the Partnership Agreement, Illinois Paper "represent[ed] and warrant[ed] that all lease transactions presented to [Lyon] for review are valid and fully enforceable agreements."  (Lyon SUF ¶ 10; Partnership Agreement, Ex. 1 to Lyon's Amended Complaint [114-1] ("Partnership Agreement").)  Lyon and Illinois Paper entered into the Partnership Agreement on or about October 20, 2008.  (Lyon SUF ¶ 9.)

Lyon and the Village then proceeded to enter into their financing agreement for new copier equipment supplied by Illinois Paper, referring to the agreement as a Value Lease Agreement (the "ILPCC Lease Agreement").  Pursuant to the ILPCC Lease Agreement, the Village was required to make monthly payments of $9,500 to Lyon for 72 months, totaling

---

[4]  It is not disputed that the Village's remaining balance under the COTG Lease was approximately $148,200 as of October 2008, but the parties have not explained how they arrived at this figure.  In a letter to the Village dated May 29, 2009, Illinois Paper states that, on May 15, 2009, Lyon "re-quot[ed]" the amount due under the COTG Lease, and that the remaining balance as of May 2009 was $154,999.30 (not $148,200).  (Letter from Matt Lichius, Vice President, Illinois Paper & Copier, to the Village of Bensenville, Re: Chicago Office Technology Group/US Bank Lease Contract, May 29, 2009, Ex. 15 to Lyon SUF.)  It also appears that the $148,200 balance discussed by the parties did not include the balance due on the paper-folding machine under the COTG Lease Supplement.  (Lyon SUF ¶ 10; Deposition of Michelle Musson Nahas, U.S. Bank ("Musson Decl.") ¶ 29, Ex. A to Lyon SUF.)  Illinois Paper contends that it agreed to pay the Village's obligations on the COTG copier equipment, but not to pay the Village's obligations under the COTG Lease Supplement, because the Village was interested in keeping the folding machine.  (Letter from Matt Lichius, Vice President, Illinois Paper & Copier, to the Village of Bensenville, Re: Chicago Office Technology Group/US Bank Lease Contract, May 29, 2009, Ex. 15 to Lyon SUF); *see also* Lyon SUF ¶ 27 ("The Village elected to retain the [folding machine], such that Illinois Paper's payments of $148,200 . . . to Lyon related solely to the COTG Equipment.")

$684,000. (Lyon SUF ¶ 28; ILPCC Lease Agreement, Ex. 2 to Am. Compl. [114-2].)

Significantly, although the parties labelled the agreement a lease, they contemplated the

possibility that their agreement might be construed as a security agreement, expressly providing

for Lyon to make a UCC filing to record its interest in the copier equipment:

> 12. UCC FILINGS: You [the Village] grant us [Lyon] a security interest in the equipment if this Agreement is deemed a secured transaction and you authorize us to record a UCC-1 financing statement or similar instrument, and appoint us your attorney-in-fact to execute and deliver such instrument, in order to show our interest in the equipment.

(ILPCC Lease Agreement ¶ 12.) The agreement "[could not] be cancelled or terminated" by

either party (*id.* at 1), but the parties identified a narrow set of circumstances that would excuse

performance on the part of the Village:

> 18-C. NON APPROPRIATION: In the event that Customer [the Village] is in default under the Agreement because (1) Funds are not appropriated for a fiscal period subsequent to the one in which the Agreement was entered into which are sufficient to satisfy all of Customer's obligations under the Agreement during said fiscal period, (2) Such non-appropriation did not result from any act or failure to act of customer, (3) Customer has exhausted all funds legally available for all payment due under the Agreement; and (4) There is no other legal procedure by which payment can be made to Owner [Lyon], Then, provided (a) Customer has given Owner written notice of the occurrence of paragraph 1 above thirty (30) days prior to such occurrence; (b) Owner has received a written opinion from Customer's counsel verifying the same within ten (10) days thereafter; and (c) the Customer does not directly or indirectly purchase, lease or in any way acquire any services or equipment supplied or provided for hereunder, upon receipt of the equipment delivered to a location designated by Owner, at Customer's expense, Owner's remedies for such default shall be to terminate the Lease . . . retain the advance payment, if any; and/or sell, dispose of, hold, use or rent the equipment as Owner in its sole discretion may desire, without any duty to account to Customer.

(*Id.* ¶ 18-C.) The parties also executed an Addendum to the Lease Agreement, which sets forth

the Village's options at the conclusion of the Lease term:

> Section 1. AGREEMENT: . . . At the end of the 72 month Agreement, Customer [the Village] shall have the following options: (1) Return the equipment to [Lyon] . . . (2) Purchase the equipment for the Fair Market Value, (3) Upgrade the equipment into a new Agreement, [or] (4) Renew the Agreement on a month to month basis until equipment is returned to [Lyon].

(Addendum to ILPCC Lease Agreement at 2-3.)  The Addendum also outlines remedies available to Lyon if the Village were to default under the agreement:

> Section 12. DEFAULT AND REMEDIES: . . . .  If Customer [the Village] is ever in default, Owner [Lyon] can terminate this Agreement and require that Customer pay the sum of (1) the unpaid balance of this Agreement (discounted at 6%); (2) and return the equipment to Owner to a location designated by Owner.  Owner may also use any of the remedies available to Owner under article 2A of the Uniform Commercial Code as enacted in the State of Illinois.  In the event of default, the non-defaulting party shall be entitled to all available remedies at law or in equity.  The non-prevailing party in any litigation to enforce the terms of this agreement shall pay the prevailing party's attorney fees and court costs. . . .

(*Id.*)  Lyon acknowledges that, although the agreement was characterized as a lease, internally Lyon had booked the contract as part of its "$1 out program," meaning that once the final payment was made, the Village would own the equipment.  (Lyon's Response to Illinois Paper's L.R. 56(b)(3)(C) Statement of Additional Facts ("Lyon's Resp. to Ill. Paper Add. Facts") at 13; Musson Decl. ¶ 41.)

## C.    Execution and Performance of the Agreements

During a Special Village Board of Trustees Meeting on October 27, 2008, the Village President and Village Board reviewed Resolution No. R-165-2008, entitled "A Resolution Authorizing the Execution of an agreement with Illinois Paper and Copier, Inc. for Certain Photocopier Services."  (Lyon SUF ¶ 12; Minutes of the Special Village Board of Trustees Meeting at 4, Ex. C to Ill. Paper SUF.)  The Board then unanimously adopted the Resolution on a roll call vote.[5]  (*Id.*)  That same day, Village Manager James Johnson executed the ILPCC

---

[5]      During this Meeting, the Village Board passed ten other Resolutions, including "A Resolution Authorizing the Execution of a Purchase Order for One Squad Car and Two Unmarked Cars," "A Resolution Authorizing the Execution of Contracts and a Purchase Order with Contractual Hockey Bench Coach Instructors Ending April 30, 2009," and "A Resolution Authorizing the Execution of a Purchase Order with Precision Mechanical."  The Village Board also reviewed several Ordinances, some of which were adopted and some of which were voted to be held for a second reading.  The Ordinances included "An Ordinance Authorizing a Conditional Use Permit for Outdoor Storage and Site Plan Review for 500 Eastern Avenue, Mario's Trucking/Excellent Bindery," "An Ordinance Authorizing a Conditional Use Permit and Minor Motor Vehicle Repairs for 477 Thomas Drive, Unit C, Turbo Express," and "An Ordinance Determining the Prevailing Wages in the Village of Bensenville."  (Lyon SUF ¶ 12; Ex. C to Ill. Paper SUF at 3-5.)

Lease Agreement on behalf of the Village. (ILPCC Lease Agreement at 1.) In signing the ILPCC Lease Agreement, Johnson warranted that he "ha[d] full power and authority to bind [the Village], [and] . . . further warrant[ed] that its governing body has taken the necessary steps . . . under applicable law to arrange for acquisition of the Equipment; the approval and execution has been in accordance with all applicable open meeting laws; and that a resolution of the governing body of [the Village] authorizing execution of the Agreement has been duly adopted . . . ." (*Id.* ¶ 18-B.) For reasons unexplained in the record, Lyon did not execute the ILPCC Lease Agreement until December 11, 2008. (Lyon SUF ¶ 11.) On the following day, December 12, 2008, Lyon filed a UCC-1 Financing Statement, providing notice of its security interest in the copier equipment. (UCC-1 Financing Statement, Ex. 26 to Ill. Paper Resp. to Lyon and Village SUF [178-1].)

After the Lease Agreement was executed, on December 12, 2008, Lyon purchased the copier equipment from Illinois Paper for $510,658.19. (Lyon SUF ¶ 13.) How the parties arrived at this $510,658.19 figure is disputed, as is the $684,000 total rent amount owed by the Village. Illinois Paper contends that these figures included the $148,200 outstanding balance the Village owed to Lyon under the COTG Lease Agreement, which Illinois Paper asserts it had agreed to pay to Lyon on the Village's behalf. As the court understands it, Illinois Paper's position is that Lyon overpaid Illinois Paper for the copier equipment by $148,200, which Illinois Paper agreed to return to Lyon, on behalf of the Village, to reimburse Lyon for losses on the COTG Lease. The Village itself would ultimately pay that amount, as part of the monthly payments the Village owed to Lyon under the ILPCC Lease Agreement. (Ill. Paper Add. Facts [175] ¶ 11.) In support, Illinois Paper notes that the suggested retail price of the copier equipment was $354,366—approximately $156,000 less than the $510,658 Lyon paid Illinois Paper to purchase it. (*Id.* ¶¶ 9-10.) Illinois Paper also calls attention to the fact that on October 28, 2008, the day after the ILPCC Lease Agreement was signed by the Village's representative, Illinois Paper agreed to "escrow" $148,200 to the Village. (Check Request: Payoff Escrow Commitment, Ex.

7

35 to Ill. Paper Add. Facts; Ill. Paper Add. Facts ¶ 12.)[6]  This shows, according to Illinois Paper, that a "buyout" of the COTG Lease was intended to be part of the deal from the beginning.  (Ill. Paper Add. Facts ¶¶ 11-17.)

Lyon sees things differently: Lyon denies that the $148,200 balance owed under the COTG Lease was "rolled into" the ILPCC Lease Agreement, or that it directed Illinois Paper to include any "buyout" of the COTG Lease in its pricing of the copier equipment.  (Lyon SUF ¶¶ 16, 18.)  Rather, Lyon contends that it expected the Village to make payments under both the COTG Lease and the ILPCC Lease, and points out that it continued to seek payment from the Village pursuant to the COTG Lease throughout the ILPCC Lease term.  (*Id.* ¶ 19.)  On February 19, 2009, for example, Amy Wakefield, an Account Specialist at Lyon Financial, e-mailed Lei Wesolowski from the Village's Finance Department, stating that Lyon would not accept payment from Illinois Paper on the COTG Lease and insisting that the Village itself continue to make payments due under the COTG Lease.  (Musson Decl. ¶ 21; E-mail from Amy Wakefield to Lei Wesolowski, Re: US Bank Invoices 500-0080076-00 500-0080076-001, Feb. 19, 2009, Ex. 9 to Musson Decl.)  Lyon acknowledges that it was aware, at the time of the ILPCC transaction, of the possibility that Illinois Paper might pay off the COTG Lease on behalf of the Village, but Lyon contends that it did not know the details of any buyout agreement between Illinois Paper and the Village until May 2009, when the Village notified Lyon that Illinois Paper had agreed to pay off the COTG Lease.  (Lyon SUF ¶ 20; Lyon Resp. to Ill. Paper Add. Facts ¶ 11.)  (Lyon does not say precisely when or how the Village notified Lyon of this.)

---

[6]      It is not clear what actions Illinois Paper took in order to "escrow" these funds to the Village.  While the parties do not dispute that Illinois Paper put the funds in escrow, the only evidence of the escrow is a document signed by Matt Lichius, Vice President of Sales for Illinois Paper, showing an "escrow payoff commitment" by Illinois Paper to the Village in the amount of $148,200.  The "date of funding," according to the document, was October 28, 2008.  (Check Request: Payoff Escrow Commitment, Ex. 35 to Ill. Paper Add. Facts.)   Illinois Paper has identified no other documentary evidence of the alleged understanding that the ILPCC Lease monthly payments were inflated to compensate Lyon for its losses on the COTG deal (or for overpayment for Illinois Paper's equipment).

Despite its professed ignorance about the buyout agreement between Illinois Paper and the Village, Lyon did accept two payments from Illinois Paper on behalf of the Village as a partial buyout of the COTG Lease, as early as March and April 2009. First, on March 19, 2009, Illinois Paper paid Lyon $14,405.70 on behalf of the Village under the COTG Lease. (Lyon SUF ¶¶ 21-22.) On April 21, 2009, Illinois Paper paid the Village $7,125: the Village reported this to Lyon and then paid Lyon that same amount to satisfy its April COTG Lease payment. (*Id.* ¶ 23; E-mail from Ed Bowser, Network Administrator, Village of Bensenville, to Amy Wakefield, Account Specialist, U.S. Bank, Re: Follow up, Apr. 22, 2009, Ex. 14 to Lyon SUF.) As reflected in a Letter of Understanding from Jean DeGier, Vice President of Operations at Lyon, to James Johnson, the Village Manager, Lyon accepted these payments with the understanding that the parties would continue to try and "resolve issues regarding the buyout of the [COTG Agreement]," and that its acceptance of payment from Illinois Paper would "in no way reliev[e] the Village from its obligations under the [COTG Agreement]."[7] (Letter of Understanding in Regards to Village of Bensenville Lease Agreements with US Bancorp Office Equipment Finance Services, Ex. 12 to Lyon SUF; Lyon SUF ¶¶ 21-22.)

On May 27, 2009, Lyon sent the Village a letter formally accepting a $126,669 payment from Illinois Paper to buy out the Village's obligation on the COTG Lease but reserving Lyon's rights to seek payment from the Village for any remaining balance under the COTG Lease and

---

[7]    This undated letter suggests that Illinois Paper made these payments to cover the Village's monthly costs under the COTG Lease while Lyon was considering whether to accept the terms of the "buyout." (Letter of Understanding in Regards to Village of Bensenville Lease Agreements with US Bancorp Office Equipment Finance Services, Ex. 12 to Lyon SUF.) Internal Lyon e-mail communications further show that, while at first Lyon was unwilling to agree to a proposed buyout of the COTG Lease by Illinois Paper, by May 2009, it had decided to accept that proposal. (*See* Internal Lyon Email, "Fw: US BANK INVOICES 500-0080076-000 500-0080076-001 VILLAGE OF BENSENVILLE," Feb. 20, 2009, Ex. 20A to Ill. Paper Add. Facts [177-1]; Internal Lyon Email, "RE: revised quotes," May 1, 2009, Ex. 34 to Ill. Paper Add. Facts [179-1].) It also appears from the record that Illinois Paper's payments were based on an agreement between Illinois Paper and the Village that Illinois Paper would be responsible for the COTG Lease payments beginning January 13, 2009. (Email Exchange Between Illinois Paper and the Village "RE:FW: Monies being sent from Illinois Paper," Ex. B to Village Resp. to Ill. Paper Add. Facts [190-1].)

COTG Lease Supplement.[8]  (Lyon SUF ¶ 25.)  Together with Illinois Paper's March and April payments, this brought Illinois Paper's total payments on behalf of the Village to $148,200. Subsequently, on May 29, 2009, Illinois Paper sent a letter to the Village, confirming, among other things, that: (1) Illinois Paper had agreed to buy out the COTG Lease for $148,200; (2) Lyon had refused to "short pa[y]" Illinois Paper for the copier equipment by $148,200, so that Illinois Paper could redirect these funds towards the balance owed by the Village on the COTG Lease;[9] (3) Illinois Paper itself had already paid $21,531 against the Village's obligations under the COTG Lease; (4) Illinois Paper agreed to pay an additional $126,669 to buy out the COTG Lease; and (5) Illinois Paper's payments did not relieve the Village from its obligations to pay any remaining balance on the COTG Lease or COTG Lease Supplement.  (*Id.* ¶ 24 (citing Letter from Matt Lichius, Vice President, Illinois Paper & Copier, to the Village of Bensenville, Re: Chicago Office Technology Group/US Bank Lease Contract, May 29, 2009, Ex. 15 to Lyon SUF).)  Months later, on or about November 18, 2009, Illinois Paper and the Village executed an agreement confirming Illinois Paper's final $126,669 payment, as well as its $148,200 buyout of the COTG Lease.  (Re: Buyout of existing US Bank Lease, Ex. 16 to Ill. Paper Response to Lyon and Village SUF.)  Illinois Paper paid $126,669 to Lyon by check dated November 19, 2009.  (Lyon SUF ¶ 26.)

_____

[8]     As noted earlier, it appears that the Village's outstanding balance due on the COTG Lease Supplement, for the paper-folding machine, was not included in the $148,200 "buyout" agreement between Illinois Paper and the Village.  (Lyon SUF ¶ 27.)  Perhaps, then, any "remaining balance" due on the COTG Lease and Lease Supplement after the buyout would relate to the paper-folding machine.  On the other hand, the court also previously noted a discrepancy between the $148,200 buyout amount and the $154,999 balance quoted by Lyon in May 2009.  Further, although the parties have not provided the court with the amount of the balance due on the COTG Lease Supplement, the Village ultimately decided to keep the folding machine, and on February 11, 2010, the Village entered into a Purchase Agreement and Settlement of Claims related to the COTG Lease Supplement, whereby the Village paid $20,000 to Lyon to purchase the folding machine.  (*Id.* (citing Musson Decl. ¶ 29).)

[9]     The court is uncertain precisely what Illinois Paper meant by this reference to being "short paid."  Perhaps Illinois Paper had proposed that Lyon pay a lower price for the equipment.

### D. The Village Declares the ILPCC Lease Unenforceable

Before Illinois Paper and the Village entered into the agreement confirming Illinois Paper's final payment of $126,669, however, the Village had made an initial determination that the ILPCC Lease Agreement was void under Illinois law. (Village L.R. 56.1(a)(3) Statement of Facts ("Village SUF") [163-2] ¶ 14.) Who or what may have prompted this determination is not explained in the record. On September 25, 2009, the Village notified Lyon that the Village had concluded the ILPCC Lease was void and unenforceable because it exceeded the five-year term authorized by 65 ILCS § 5/11-76-6 of the Illinois Municipal Code. That section governs "Lease of Equipment and Machinery" and provides:

> [T]he corporate authorities of each municipality may enter into a lease for a period of not to exceed 5 years for such equipment and machinery as may be required for corporate purposes when authorized by the affirmative vote of two-thirds of the corporate authorities.

(*Id.*; Ex. 1 to Lyon's Response to Village Motion for Summary Judgment ("Lyon Resp. to Village Mot.").) Approximately one month later, on October 19, 2009, the Village also notified Illinois Paper of its legal position that the Lease Agreement was invalid under Illinois law. (Letter from Sean Conway, Bon, Dickson & Associates, P.C., to Matt Lichius, Illinois Paper, October 19, 2009, Ex. 31 to Ill. Paper Add. Facts.) Communications between the Village and Lyon in November 2009 and June 2010 show that the two parties attempted to reform the Lease Agreement to comply with 65 ILCS § 5/11-76-6 by entering into a new five-year lease that would include some of the 39 pieces of copier equipment supplied under the ILPCC Lease. (Village SUF ¶ 17; Letter from Sean Conway, Bon, Dickson & Associates, P.C., to Troy Kepler, Lyon Financial Services, Re: Village of Bensenville Leases with U.S. Bank, November 13, 2009, Ex. A to Village SUF.) For example, on November 13, 2009, an attorney for the Village sent a letter to Lyon's in-house counsel, requesting price quotes on five-year leases based on a few different combinations of the equipment. (*Id.*)

The record does not contain any response from Lyon to the Village's November 13, 2009 letter, nor does it contain any price quotes Lyon may have offered to the Village. It does, however, contain a June 2, 2010 letter from the Village's attorney to Lyon's in-house counsel stating that none of the options presented by Lyon were acceptable because, unlike the ILPCC Lease Agreement, "none of [Lyon's proposed] options included maintenance on the equipment" and as a result, they "would require the Village to incur the additional expense of maintenance." (Village SUF ¶ 18; Letter from Sean Conway, Bond, Dickson & Associates, P.C., to Troy Kepler, Lyon Financial Services Re: Village of Bensenville/U.S. Bank Equipment Lease, June 2, 2010, Ex. A to Village SUF.) Because "[Lyon had] indicated, on a number of occasions, that the options were not open to discussion and that if the [parties] could not agree on one of the options, [Lyon] desired to pick up the equipment and go separate ways," counsel for the Village announced in the letter that "it was [now] time for Lyon to pick up the equipment subject to the Lease, and for the parties to go their separate ways." (*Id.*) In a July 6, 2010 letter, counsel for the Village advised Illinois Paper that the ILPCC Lease Agreement was invalid and that the Village's attempts to negotiate a valid lease had been unsuccessful. (Letter from Sean Conway, Bond, Dickson & Associates, P.C. to Terry Yormark, President, Illinois Paper & Copier, re: Maintenance for Equipment Subject to U.S. Bank Lease 177971, July 6, 2010, Ex. 38 to Ill. Paper Add. Facts.)

In response to the Village's announcement that it would not pay the remaining balance on the ILPCC Lease Agreement, Lyon wrote a letter on July 19, 2010, to Illinois Paper, demanding that Illinois Paper "repurchase" the ILPCC Lease.[10] (Lyon SUF ¶ 31; Letter from D. Alex Darcy, Askounis & Darcy, PC, to Terry Yormark, President, Illinois Paper & Copier, Re:

---

[10] Again, the terminology is a bit opaque, and the court is uncertain of what Lyon intended in demanding that Illinois Paper "repurchase" the ILPCC Lease. Presumably, Lyon sought to recover from Illinois Paper the payments that the Village was refusing to make (*see* Ill. Paper Ans. ¶ 15); pursuant to the Partnership Agreement, Illinois Paper agreed to "indemnify and hold [Lyon] harmless from any loss or claim resulting from [its] breach of the . . . representations and warranties." (Partnership Agreement at 2.)

Lyon Financial Services v. Illinois Paper & Copier Company, July 19, 2010, Ex. to 3 to Illinois Paper's Answer, Counterclaims and Third Party Claims ("Ill. Paper's Ans.") [13-3].) Illinois Paper was required to do so, Lyon asserted, because Illinois Paper had breached its representations and warranties to Lyon as set forth in the Partnership Agreement. (*Id.*) As noted, these representations and warranties included an assurance by Illinois Paper that any lease transactions that Illinois Paper presented to Lyon would be valid and enforceable. (Partnership Agreement at 2.)

On August 25, 2010, Lyon notified the Village that the copier equipment had been repossessed and would be sold by private sale on or after September 4, 2010. (Letter from Janet King, Collateral Recovery Specialist, Lyon Financial Services, to James Johnson, Village of Bensenville, re: Notice of Disposition of Collateral, August 15, 2010, Ex. A to Village SUF.) In its letter, Lyon also asserted that because the Village had defaulted under the ILPCC Lease Agreement, the Village owed Lyon $503,501. (*Id.*) Counsel for the Village responded in a letter dated September 2, 2010, refusing to make any further payment to Lyon on the ground that the ILPCC Lease Agreement was invalid under the Illinois Municipal Code. (Letter from Sean Conway, Bond, Dickson & Associates, P.C. to Janet King, Collateral Recovery Specialist, Lyon Financial Services, Re: U.S. Bank Contract No. 177971, September 10, 2010, Ex. A to Village SUF.)

Lyon subsequently terminated the agreement and retrieved the copier equipment from the Village, incurring $4,296 in repossession fees. (Lyon SUF ¶ 35.) Lyon remarketed and sold the two-year-old equipment for $18,956.25, with the net resale amount of $14,660.25 being credited to the ILPCC Lease. (*Id.* ¶ 34.) At the time of termination, the Village had made nineteen $9,500 payments, or a total of $180,500. (Ill. Paper Add. Facts ¶ 36.) Lyon alleges that it has suffered damages in the amount of $591,419.09 as a result of the breach by Illinois Paper, or alternatively, the Village. To calculate those damages, Lyon begins with the $443,529.40 balance remaining on the ILPCC Lease, and adds interest in the amount of

$162,549 as of June 5, 2015, which continues to accrue at the rate of $93.06 per day, less a credit of $14,660.25 for the equipment resale. (Lyon SUF ¶ 35.) Lyon also alleges that it has incurred attorneys' fees and costs in the amount of $226,101.72 in this litigation. (*Id.* ¶ 36.)

## II. Procedural History

The procedural history in this case is long and tortured, dating from November 2, 2010, when Lyon filed its initial Complaint against Illinois Paper for breach of the Partnership Agreement. (Lyon Compl. [1].) In its Answer, Illinois Paper asserted various affirmative defenses, including that Illinois Paper had not breached its warranty because the ILPCC Lease Agreement was enforceable and did not violate 65 ILCS § 5/11-76-6. (Ill. Paper's Ans. [13] ¶¶ 21-25.) Illinois Paper also brought a counterclaim against Lyon for breach of fiduciary duty, and third-party claims against the Village and Village Manager James Johnson for fraud, breach of contract, and aiding and abetting Lyon's breach of fiduciary duty.[11] (*Id.* ¶¶ 26-46.) Illinois Paper alleged, among other things, that the ILPCC Lease Agreement between Lyon and the Village was enforceable because it was not a true lease, but rather a purchase agreement through which the Village was able to acquire new copier equipment from Illinois Paper and refinance its existing obligations under the COTG Lease. (*Id.* ¶ 17.) Lyon, the Village, and Johnson moved to dismiss Illinois Paper's claims.

The case was assigned initially to Judge William Hibbler of this court. In a May 4, 2011 Memorandum Opinion and Order, Judge Hibbler dismissed Illinois Paper's breach of fiduciary duty counterclaim against Lyon, as well as its third-party fraud claim and aiding and abetting claim against the Village and Johnson. (*See* May 4, 2011 Mem. Opinion and Order [44] at 1-2.) The court also dismissed Illinois Paper's breach-of-contract claim against the Village and Johnson, concluding that the ILPCC Lease Agreement was indeed a lease. Judge Hibbler

---

[11]    Illinois Paper claimed that the Partnership Agreement entered into by Illinois Paper and Lyon made them "partners" owing fiduciary duties to one another. (Ill. Paper's Ans. ¶ 44.) Lyon breached this duty, Illinois Paper alleged, by proceeding with the lawsuit without first seeking a determination as to the Lease Agreement's enforceability. (*Id.* ¶ 45.)

noted the Village's contention that the ILPCC Lease was "unenforceable because it was for longer than sixty months, in violation of the Illinois Municipal Code" 65 ILCS § 5/11-76-6, and that Lyon itself had not challenged that assertion: "Lyon never sought a determination from any court that the agreement was in fact unenforceable." (*Id.* at 4-5.) The court was unmoved by Illinois Paper's argument that the Lease Agreement was not a true lease:

> Illinois Paper's argument flies in the face of contractual language. . . . Illinois Paper . . . urges the Court to not only ignore the title of the Lease Agreement ("Value Lease Agreement"), but to ignore virtually all the language therein. The agreement clearly provides for a six-year term with monthly payments of $9,500. The agreement does provide the Village with an option to buy the equipment at the end of the lease. But it also provides the Village with the option to renew the lease or return the equipment at the end of the lease. The fact that such a purchase may not require any additional payment does not automatically convert the agreement to a purchase agreement. . . . Illinois Paper does not cite to a single case holding that a Court may construe a lease agreement with an option to buy as a purchase agreement simply because the lessee ultimately ends up paying more than the original fair market value of the leased property in monthly payments.

(*Id.* at 11-12.)

Judge Hibbler also rejected the notion that Illinois Paper could rely on representations of law made by Johnson when he signed the ILPCC Lease Agreement.[12] In response to that aspect of the decision, Illinois Paper promptly moved for judgment on the pleadings, arguing that if the Village Manager's representations were not actionable, then Illinois Paper's warranties to Lyon in the Partnership Agreement were also not a basis for recovery. The court granted that motion, as well. It concluded, in a February 6, 2012 ruling, that Illinois Paper's representation in the Partnership Agreement concerning the legal enforceability of the ILPCC Lease Agreement could not form the basis of a breach of contract or breach of warranty claim under Illinois law because it was a representation of law, not fact. (*See* February 6, 2012 Order [63] at 1-3.)

---

[12] As noted earlier, Johnson had represented that he had "full power and authority to bind [the Village]," and further warranted that "[the Village's] governing body ha[d] taken the necessary steps . . . under applicable law to arrange for the acquisition of the Equipment." (ILPCC Lease Agreement ¶ 18-B.)

Lyon appealed, arguing that (1) the court erred when it applied Illinois law, rather than Minnesota law, in interpreting the Partnership Agreement; (2) the court erred in holding that Illinois Paper's representation was a matter of law, not fact; and (3) even if Illinois Paper's representation was one of law, Lyon was entitled to rely on the representation because, under Minnesota law, reliance is not an element of a breach-of-warranty claim. Brief of Appellant Lyon Financial Services, *Lyon Fin. Servs., Inc. v. Ill. Paper and Copier Co.*, 732 F.3d 755 (7th Cir. 2013) (No. 12-2210). As the Partnership Agreement includes a Minnesota choice-of-law provision, the Seventh Circuit determined that Minnesota law applies, and certified two questions to the Minnesota Supreme Court: (1) whether reliance is an element of a breach of warranty action under Minnesota law, and if so, what kind of reliance is required; and (2) whether a contracting party is entitled to rely on another party's representation of law. *Lyon Fin. Servs.*, 732 F.3d at 758-59, 765-67. The Minnesota Supreme Court reformulated the two questions into a single inquiry and then answered it in the affirmative, holding that "a claim for breach of a contractual representation of future legal compliance is actionable under Minnesota law without proof of reliance." *Lyon Fin. Servs., Inc. v. Ill. Paper and Copier Co.*, 848 N.W.2d 539, 540, 542 (Minn. 2014). In response, the Seventh Circuit reversed this court's judgment in favor of Illinois Paper and remanded the case for further proceedings consistent with the opinions of the Minnesota Supreme Court and the Seventh Circuit. *Lyon Fin. Servs., Inc. v. Ill. Paper and Copier Co.*, 577 Fed. Appx. 606, 606-07 (Mem.) (7th Cir. 2014).

On December 12, 2014, Lyon filed an Amended Complaint, alleging a breach-of-contract claim against Illinois Paper, and in the alternative, a breach-of-contract claim against the Village, in the event the ILPCC Lease Agreement is deemed enforceable. (Am. Compl. ¶¶ 17-22.) Illinois Paper filed an Amended Answer on December 15, 2014, in which it re-asserted many of the affirmative defenses it had alleged in its initial Answer: (1) Lyon's claims against Illinois Paper are premature because there has been no determination that the Lease Agreement is unenforceable; (2) the Lease Agreement is in fact enforceable under Illinois law; (3) the Village

16

is estopped from denying the enforceability of the Lease Agreement; (4) Lyon cannot recover because it caused the purported breach; and (5) because Lyon paid Illinois Paper for the copier equipment having full knowledge of the facts, Lyon's claim is barred by the voluntary payment doctrine. (Ill. Paper Amended Ans., Aff. Defenses, Third Party Claim [115] ¶¶ 24-29.) Illinois Paper also brought third-party claims against the Village under theories of quasi-contract and unjust enrichment. (*Id.* ¶¶ 30-34.)

The Village moved to dismiss the claims brought against it by both Lyon and Illinois Paper. (Village Mot. to Dismiss [116] at 3.) During a January 28, 2015, hearing on those motions, the court asked counsel for the Village whether Lyon's claim against it is barred by the statute of limitations. (Mot. Tr. [164] at 6:23-24.) Counsel for the Village responded: "In my opinion, your Honor, I have not raised a statute of limitations [defense] because what [Lyon is] bringing is a contract claim." (*Id.* at 7:1-2.) On January 28, 2015, this court granted the Village's motion to dismiss Illinois Paper's third-party claims, on the grounds that Illinois Paper had previously brought claims against the Village but then failed to appeal Judge Hibbler's 2011 order dismissing those claims. (Jan. 28, 2015 Order [121] at 1.) The court denied the Village's motion to dismiss Lyon's claims, however, and held that Lyon was permitted to seek relief against the Village despite its failure to seek such relief earlier. (*Id.*) The court specifically noted that "Plaintiff Lyon Financial Services, Inc. did not file any claims against the Village prior to the appeal," but "the Village acknowledges that Lyon's claims, if otherwise cognizable, are timely." (*Id.*) On the same date, January 28, 2015, the court directed the Village to answer Lyon's amended complaint within twenty-one days. (*Id.*)

The Village has not filed an answer to Lyon's amended complaint. Instead, on February 18, 2015, the Village moved for summary judgment, and amended that motion several months later. (Village Motion for Summary Judgment [122]; Village Amended Motion for Summary Judgment ("Village Mot.") [163].) In its motion, the Village argues that the court should enter judgment for the Village on the ground that the ILPCC Lease Agreement is void

and unenforceable under Illinois law, 65 ILCS § 5/11-76-6. (Village Mot. at 1.) The Village also argues for the first time in its amended summary judgment motion that, even if the court were to find that the Lease is enforceable under Illinois law, Lyon's breach-of-contract claim against it is barred by the four-year statute of limitations set forth in the Illinois Uniform Commercial Code, 810 ILCS § 5/2A-101 *et seq.*, which applies to equipment leases. (Village Memorandum in Support of Motion for Summary Judgment ("Village Mem.") [163-1] at 5-6.) Illinois Paper, for its part, asks the court to enter an order of partial summary judgment, holding that the Lease Agreement is enforceable against the Village, and Illinois Paper is therefore not liable to Lyon for any breach of representation or warranty regarding its enforceability. (Illinois Paper Motion for Summary Judgment ("Ill. Paper Mot.") [142] at 10.) According to Illinois Paper, because the ILPCC Lease Agreement is not a true lease, the five-year-term limitation imposed by 65 ILCS § 5/11-76-6 does not apply. (*Id.* at 2-3.) And if it is a true lease, Illinois Paper argues, the court should nevertheless grant summary judgment in its favor because the provision invoked by the Village, 65 ILCS § 5/11-76-6, does not govern the agreement. Instead, Illinois Paper contends the ILPCC Lease is authorized by 65 ILCS § 5/11-76.1-1, which provides:

> The corporate authorities of each municipality having a population of less than 500,000 inhabitants have the power by ordinance adopted by an affirmative vote of two-thirds of the elected corporate authorities then holding office: (i) To purchase or lease real or personal property for public purposes pursuant to contracts or leases which provide for the consideration for such purchase or lease to be paid in annual installments during a period not exceeding 20 years.

(*Id.* at 3.)[13]

Lyon, too, seeks summary judgment. In its motion, Lyon seeks judgment in its favor and against Illinois Paper in the amount of $817,520.81, or alternatively, against the Village in the same amount. (Lyon Motion to Summary Judgment ("Lyon Mot.") [144] at 1.) Lyon argues that, if the ILPCC Lease Agreement is unenforceable, there is no genuine issue of material fact with respect to Illinois Paper's breach of the Partnership Agreement. (Lyon Memorandum in Support

---

[13]     The Village of Bensenville had a population of approximately 20,000 in 2008. (Ill. Paper SUF ¶ 18.)

of Motion to Summary Judgment ("Lyon Mem.") [145] at 4.)  Alternatively, if the ILPCC Lease Agreement is enforceable, Lyon asserts that it is entitled to judgment as a matter of law against the Village for breach.  (*Id.* at 17.)  Regarding the timeliness of its claims, Lyon makes four arguments: (1) the Village waived the statute-of-limitations defense; (2) the Village is equitably estopped from asserting the defense; (3) the statute of limitations should be equitably tolled; or (4) the ten-year statute of limitations set forth in 735 ILCS § 5/12-206 applies to Lyon's claim. (Lyon Resp. to Village Mot. [172] at 3.)

## DISCUSSION

Summary judgment is proper if the moving party shows that there is no genuine dispute of material fact such that the movant is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986) (citing FED. R. CIV. P. 56(a)).  A fact is material if it might affect the outcome of the suit under governing law, and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).  Where, as here, the parties have filed cross-motions for summary judgment, the court is required to view the facts for purposes of each motion through the lens most favorable to the non-moving party and draw all reasonable inferences in favor of the non-movant.  *Buttitta v. City of Chicago,* 803 F. Supp. 213, 217 (N.D. Ill. 1992), *aff'd* 9 F.3d 1198 (7th Cir. 1993).

The threshold issue in this case is whether the ILPCC Lease Agreement entered into between Lyon and the Village is enforceable under Illinois law.  If the Lease is unenforceable, as the Village and Lyon argue, Illinois Paper is liable to Lyon for breach of the Partnership Agreement because Illinois Paper had represented in that Agreement that all lease transactions presented to Lyon would be legally enforceable.  If the Lease Agreement is enforceable, as Illinois Paper and Lyon contend, then the Village is liable to Lyon for breach of the Lease Agreement, unless the statute of limitations bars Lyon's breach-of-contract claim.  For the

reasons discussed below, factual disputes preclude the court from determining whether the ILPCC Lease Agreement is enforceable under Illinois law. Accordingly, the parties' motions must be denied.

I.      **The Nature of The Agreement**

In determining whether the ILPCC Lease Agreement is enforceable, the court begins with the question of whether the agreement is properly characterized as a true lease or as a secured sale disguised as a lease. (Ill. Paper Mot. at 2-3; Village Reply in Support of Motion for Summary Judgment ("Village Reply") [192] at 16.) As noted, in his May 4, 2011 order, Judge Hibbler rejected Illinois Paper's argument that the Lease Agreement is not a true lease.[14] (Mem. Opinion and Order at 10-12.)

Judge Hibbler's analysis of this issue focused on the form of the ILPCC Lease Agreement. He noted, for example, that the agreement is titled "Value Lease Agreement" and "clearly provides for a six-year term with monthly payments . . . ." (Mem. Opinion and Order at 11.) In determining whether a "lease" is a true lease, or a security disguised as a lease, however, "substance prevails over form." *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 614 (7th Cir. 2005); *see also In Re JII Liquidating*, 341 B.R. 256, 266 (Bankr. N.D. Ill. 2006) (quoting *Meeker v. Beeson*, 76 Ill. App. 3d 940, 943, 395 N.E.2d 698, 700 (5th Dist. 1979)) ("'[I]n determining the character of an alleged lease . . . the courts will disregard the mere form and the words and will endeavor to reach the substance of the agreement.'"). As Judge Hibbler recognized, the Lease Agreement "provide[d] the Village with an option to buy the

_____

[14]      Lyon and the Village argue that the court's prior ruling is law of the case, which the court should not reconsider. (Lyon Mot. at 6; Village Reply at 25-26.) Under the law-of-the-case doctrine, a court generally should not reopen issues decided in earlier stages of the same litigation. *United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008) (citing *Agostini v. Felton*, 521 U.S. 203, 236, 117 S. Ct. 1997 (1997)). The Seventh Circuit has reiterated, however, "that the law of the case [ ] is a discretionary doctrine that does not limit the district court's power to reopen what already has been decided." *Id.* Instead, the doctrine "is . . . a presumption, one whose strength varies with the circumstances." *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995). The court may reconsider its previous ruling if there is a compelling reason, such as where the court's earlier determination was erroneous. *Harris*, 531 F.3d at 513 (quoting *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 572 (7th Cir. 2006)).

equipment at the end of the lease" for potentially "[no] additional payment." (Mem. Opinion and Order at 11.) True, "such a purchase . . . does not automatically convert the agreement into a purchase agreement" (*id*.), but the Village's option to purchase the goods upon completion of the lease for no additional consideration does suggest that the "lease" may be a disguised sale.

Under Illinois law, the determination of whether a transaction in the form of a lease is a true lease or a secured transaction is controlled by Section 1-203 of the Illinois Uniform Commercial Code, 810 ILCS § 5/1-203. This Section provides, in pertinent part, that:

> Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case. [ ] A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right of possession and the use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, **and**: (1) the original term of the lease is equal to or greater than the remaining economic life of the goods; (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods; (3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; **or** (4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal consideration upon compliance with the lease agreement.

810 ILCS § 5/1-203(a)-(b) (emphasis added). In other words, "a contract will be construed as a security interest as a matter of law if the lessee cannot terminate the agreement and any one of the four specified requirements is satisfied." *JII Liquidating*, 341 B.R. at 268.

Lyon and the Village argue that the ILPCC Lease Agreement did not create a security interest in the equipment because the Village was free to terminate the agreement; specifically, citing Section 18-C, they urge, the agreement gave the Village an "out" in the event of "non-appropriation." (*See* Lyon Mem. at 7.) As this court reads the relevant section, however, Section 18-C does not allow the Village to terminate the agreement each year by non-appropriation. Rather, that section simply authorizes a remedy for default: "[i]n the event [the Village] *is in default* under the Agreement" because "[f]unds are not appropriated for a fiscal period," then the Village must return the equipment to Lyon at the Village's expense and "*[Lyon's] remedies for such default shall be to terminate the lease* . . . retain the advance

payments, if any; and/or sell, dispose of, hold, use or rent the equipment . . . ." (ILPCC Lease Agreement ¶ 18-C (emphasis added).) Nor are there any other provisions in the Lease Agreement that allow the Village to terminate the agreement.

Indeed, the Lease Agreement expressly states that it "[could not] be cancelled or terminated." (*Id.* at 1.) Section 18-C does not change this, because it does not provide the Village with any "meaningful right of termination." *See In re Nationwise Automotive, Inc.*, 250 B.R. 900, 904 (Bankr. S.D. Ohio 2000). In *Nationwise Automotive*, the court concluded that a disputed agreement was an installment purchase contract rather than a lease, in part because an addendum to the agreement containing a termination provision was never signed by the parties. *Id.* The court further held that, even assuming the addendum was binding, the agreement was not terminable because of the conditions imposed on termination—the debtor could only terminate the lease twenty-four months into the thirty-six-month term, the debtor was obligated to provide three months' notice, and the debtor was required to pay termination charges and other fees. *Id.* Unlike in *Nationwise Automotive*, the ILPCC Lease Agreement at issue here does not subject the Village to any monetary penalty for early termination. Yet the Village is permitted to default under Section 18-C of the Lease Agreement only under stringent conditions: that the Village was not responsible for the non-appropriation and had exhausted all funds legally available to it; that there was no other legal procedure by which payment could be made to Lyon; that the Village provided Lyon with 30 days' notice before non-appropriation was to occur; and that the Village agree not to "purchase, lease, or in any way acquire any . . . equipment supplied . . . hereunder." (ILPCC Lease Agreement ¶ 18-C.) [15] The practical effect

_____

[15] It is unclear whether the condition preventing the Village from acquiring "any . . . equipment supplied" under the Lease Agreement simply means that the Village could not acquire the specific equipment supplied by Illinois Paper after defaulting under the lease, or whether, as Illinois Paper argues, it means that the Village could not acquire replacement equipment from any vendor. (Illinois Paper Response to Lyon & Village Motions for Summary Judgment ("Ill. Paper Resp.") [174] at 12.) The court does not find it necessary to resolve this ambiguity, however, because the other terms contained in Section 18-C are sufficient to show that the Village had no right to terminate the contract.

of the provision is that Section 18-C provides a remedy available only in extremely limited circumstances, where the Village is essentially broke or where it would be otherwise legally impossible for it to make payments.

In short, the court does not read the default language in Section 18-C as a provision allowing for early termination by the Village. *Dieck v. Unified School District of Antigo*, 157 Wis. 2d 134, 458 N.W.2d 565 (Wis. App. Ct. 1990), cited by Lyon, is distinguishable. In *Dieck*, the court held that an agreement between a school district and leasing corporation for the lease of a new high school was a true lease, and not an installment purchase plan, based on "the key fact . . . that the lease [could] be terminated [by the school district], by non-appropriation, each year." 157 Wis. 2d at 142, 458 N.W.2d at 569. Whereas the school district in *Dieck* could merely end its obligation under the agreement by choosing not to appropriate funds, the Village of Bensenville did not have this option. Instead, the Village could only end its obligations under the ILPCC Lease Agreement if there were no legally viable way for it to make payments to Lyon.

Lyon and the Village also argue that the Lease Agreement did not give Lyon a security interest in the copier equipment because none of the four alternative factors required by 810 ILCS § 5/1-203(b) for such a finding apply. (Lyon Mem. at 8.) Again, the court disagrees that there are no material disputes concerning this issue. It appears that both factors (1) (term of lease exceeds the goods' economic life) or (4) (option to acquire goods for nominal consideration) may exist here. With respect to factor (1), the facts suggest that the term of the Lease Agreement was "equal to or greater than the remaining economic life of the [copier equipment]." 810 ILCS § 5/1-203(b)(1). At the time the Village entered into the Lease Agreement, the estimated fair market value of the copier equipment was $354,366. By August 2010, just nineteen months after the Village acquired the copier equipment, Lyon remarketed and sold the two-year-old equipment for $18,956.25. The term of the Lease Agreement was 72 months, or six years. If the value of the copier equipment had in fact depreciated by approximately 95% only two years after it was originally purchased, one can reasonably

conclude that its economic value after six years would have been zero. The economic life of the copier equipment is ultimately a factual question that neither the Village nor Lyon has addressed; at this stage, however, the court is unwilling to conclude that factor (1) is inapplicable as a matter of law.

If the copier equipment's value had diminished to zero at the end of the Lease, this would also mean that factor (4) applies—that is, the Village "ha[d] an option to become the owner of the [copier equipment] for no additional consideration or for nominal consideration upon compliance with the lease agreement." *See* 810 ILCS § 5/1-203(b)(4). Additional consideration is generally not considered nominal where, as here, "the price is stated to be the fair market value of the goods determined at the time the option [to purchase] is to be performed." 810 ILCS § 5/1-203(d)(2). Parties cannot circumvent 810 ILCS § 5/1-203, however, by providing the debtor with an option to purchase the goods for "fair market value" at the end of the agreement where they know that the fair market value of the goods would be zero. *See, e.g.*, *Nat'l Equip. Rental, Ltd. v. Priority Electronics Corp.*, 435 F. Supp. 236, 239 (E.D.N.Y. 1977) (rejecting the notion that "in a case . . . where the equipment will be essentially worthless at the end of the lease period, . . . the parties could determine whether the agreement would be a lease or a sale by the simple expedient of including or excluding a 'fair market value' option purchase price"); *In re Owen*, 221 B.R. 56, 61 (Bankr. N.D.N.Y. 1998) (option to purchase for fair market value creates an inference that the consideration is not nominal unless it can be shown that the fair market value is negligible). Indeed, Lyon acknowledges that, despite the language of the ILPCC Lease Agreement, it internally considered the contract part of its "$1 out program," meaning that once the Village made its final monthly payment, the Village would own the equipment. (Lyon Resp. to Ill. Paper Add. Facts ¶ 13; Ex. 3 to Ill. Paper Add. Facts at 41.) The projected $1 value of the copier equipment anticipated by Lyon when the agreement was signed is particularly strong evidence that the contract was intended to

create a security interest. *JII Liquidating*, 341 B.R. at 271 (quoting *Matter of Marhoefer Packing Co., Inc.*, 674 F.2d 1139, 1144-45 (7th Cir. 1982)).

The Village's fair market value purchase option could also be considered nominal under the Illinois Uniform Commercial Code because it appears to be "less than the [Village's] reasonably predictable cost of performing under the lease agreement if the option [was] not exercised." 810 ILCS § 5/1-203(d). When Lyon remarketed and sold the copier equipment in 2011, it incurred $4,296 in repossession fees. (Lyon SUF ¶ 33.) The court assumes that the Village would have incurred similar transportation costs at the end of the Lease Agreement, had the Village chosen to return the equipment to Lyon in Minnesota, instead of purchasing the equipment for itself. Thus, in order for the purchase price to be more than nominal, the fair market value of the copier equipment at the end of the six-year term would have to exceed $4,000. Again, as the equipment's value seems to have depreciated from $354,366 to $18,956 after just two years, it appears likely that after another four years, the value of the copier would have depreciated far below $4,000. In other words, the Village would have spent more money returning the equipment at the end of the agreement than it would have spent purchasing it.

At a minimum, there are disputes of fact concerning whether the test established by UCC § 1-203 is satisfied here. Because neither the Village nor Lyon has addressed what the economic value of the copier equipment would have been at the end of the Lease, when viewing the facts in the light most favorable to those parties, the court is not prepared to find that either factor (1) or (4) exists or does not exist as a matter of law. As a result, whether the ILPCC Lease Agreement was a purchase agreement that gave Lyon a security interest, or a true lease, is disputed.

## II. Enforceability of the Lease Agreement

The issues discussed above are important because the enforceability of the ILPCC Lease Agreement turns on how the agreement is characterized. Because Illinois law limits a municipality's power to contract, *Chicago Food Mgmt. v. City of Chicago*, 163 Ill. App. 3d 638,

643, 516 N.E.2d 880, 884 (1st Dist. 1987), "[a] municipal contract which is legally prohibited or beyond the power of the municipality is absolutely void and cannot be ratified by later municipal action," *Ad-Ex, Inc. v. City of Chicago*, 207 Ill. App. 3d 163, 165, 169, 565 N.E.2d 669, 671, 673 (1st Dist. 1990) (holding that variance given by Chicago to company pursuant to settlement agreement was void and unenforceable because it was agreed upon without first giving notice and holding a public hearing as required by city ordinance).   Accordingly, although a municipality cannot avoid enforcement of a contract based on some irregularity in the formation of the contract, where a contract was entered into without authority, "the municipality may avoid the enforcement of the contract . . . , even [if] the other contracting party has performed[.]"  *Elk Grove Twp. Rural Fire Protection Dist. v. Village of Mount Prospect*, 228 Ill. App. 3d 228, 234, 592 N.E.2d 549, 553 (1st Dist. 1992) (citing *McGovern v. City of Chicago*, 281 Ill. 264, 118 N.E. 3 (Ill. 1917)) (declaring fire service agreement entered into by village null and void because it allowed the village to execute blanket tax levies for extended periods of time, "den[ying] prospective administrations and taxpayers any input into future levies as required by law").

The parties point to two different provisions of the Illinois Municipal Code, both of which give municipalities authority to enter into contracts for personal property.  The Village asserts that the ILPCC Lease Agreement is an equipment lease, whose execution is governed by 65 ILCS § 5/11-76-6.  Lyon, presumably with an eye toward recovery on its warranty claim against Illinois Paper, joins the argument.  (Village Mem. at 6; Lyon Mem. at 5.).  Under 65 ILCS § 5/11-76-6,

> [t]he corporate authorities of each municipality may enter into a lease for a period not to exceed 5 years for such equipment and machinery as may be required for corporate purposes when authorized by the affirmative vote of two-thirds of the corporate authorities.

Because 65 ILCS § 5/11-76-6 authorizes equipment leases only for "a period not to exceed 5 years," the Village and Lyon argue that the Lease Agreement, which contemplates a six-year term, is void and unenforceable.  (Village Mem. at 11-12; Lyon Mem. at 5-6.)

Illinois Paper invokes a different section of the Municipal Code, 65 ILCS § 5/11-76.1-1, and asserts that the Lease Agreement is enforceable pursuant to that section. Under 65 ILCS § 5/11-76.1-1,

> [t]he corporate authorities of each municipality having a population of less than 500,000 inhabitants have the power by ordinance adopted by an affirmative vote of two-thirds of the elected corporate authorities then holding office:
>
> (i) To purchase or lease real or personal property for public purposes pursuant to contracts or leases which provide for the consideration for such purchase or lease to be paid in annual installments during a period not exceeding 20 years . . . .

(Ill. Paper Mot. at 2-3 (quoting 65 ILCS § 5/11-76.1-1)).) The Village and Lyon reject the application of 65 ILCS § 5/11-76/1.1 to the Lease Agreement. If 65 ILCS § 5/11-76.1-1 allows a municipality to enter into a twenty-year lease for office equipment, they contend, that provision is trumped by 65 ILCS § 5/11-76-6, which expressly limits leases for "equipment and machinery" to five-year terms. Further, if the court were to accept Illinois Paper's argument that the Lease Agreement is governed by 65 ILCS § 5/11-76.1-1, the Village and Lyon argue, the agreement would nevertheless be invalid because it was passed by a resolution, as opposed to an ordinance, and it provided for monthly payments, not annual installments, as required under the statute. (Village Mem. at 5-6; Village Reply at 19-20; Lyon Mem. at 13-15.) Illinois Paper acknowledges that the Village approved the Lease Agreement by resolution but argues that this irregular exercise of power by the Village does not render the agreement invalid. (Ill. Paper Mot. at 2-4.) Illinois Paper also asserts that 65 ILCS §§ 5/11-76.1-1 and 5/11-76-6 can be harmonized: while 65 ILCS § 5/11-76-6 generally limits the terms of personal property leases to five years, 65 ILCS § 5/11-76.1-1 allows for longer leases if additional conditions are met, namely, that the municipality has a population of less than 500,000, the agreement was adopted by ordinance, and it was approved by two-thirds of the corporate authorities. (Ill. Paper Resp. at 30.)

The court agrees with Lyon and the Village that, if the Lease Agreement is indeed a true lease, and if 65 ILCS § 5/11-76-6 applies, the agreement is unenforceable under Illinois law because it exceeds the five-year limitation provided in the statute. Under Illinois law, "[i]t is a fundamental rule of statutory construction that where there exists a general statutory provision and a specific statutory provision, either in the same or another act, which both relate to the same subject, the specific provision controls and should be applied." *People v. Villarreal*, 152 Ill. 2d 368, 379, 604 N.E.2d 923, 928 (Ill. 1992). As Lyon and the Village observe, 65 ILCS § 5/11-76-6 is the more specific statutory provision in this case because it governs "leases . . . for equipment or machinery," whereas 65 ILCS § 5/11-76.1-1 generally governs the "purchase or lease [of] real or personal property." Accordingly, 65 ILCS § 5/11-76.1-1 would govern leases for equipment and machinery, but also other personal-property leases, such as leases for vehicles or furniture. The two provisions, 65 ILCS § 5/11-76-6 and 65 ILCS § 5/11-76.1-1 could be harmonized as follows: while municipalities having a population of less than 500,000 inhabitants may lease personal property for a period of up to twenty years, there is an exception for leases of equipment or machinery used for "corporate purposes," which may not exceed five years.[16]

---

[16] There is also a dispute regarding the terms "corporate purposes" and "public purposes." Lyon argues that because 65 ILCS § 5/11-76-6 applies to equipment or machinery "used for corporate purposes," whereas 65 ILCS § 5/11-76.1-1 applies to personal property used "for public purposes," 65 ILCS § 5/11-76-6 is the applicable statute. (Lyon Reply at 7-8.) Illinois Paper, on the other hand, argues that "corporate purposes" and "public purposes" are synonymous. (Ill. Paper Resp. at 30-31.) There is no evidence in the record concerning the purposes for which the Village used the copier equipment supplied by Illinois Paper, so even if there is a difference between the terms "corporate" and "public," it would provide the court with little guidance in this case. In any event, the court agrees with Illinois Paper that there is no meaningful distinction between the two terms. According to the Illinois Supreme Court, a corporate purpose is one "to be expended in a manner which shall promote the general prosperity and welfare of the community . . . ." *People ex rel. Illinois Armory Board v. Kelly*, 369 Ill. 280, 286, 16 N.E.2d 693, 696 (Ill. 1938); *see also People ex rel. Moshier v. City of Springfield*, 370 Ill. 541, 549-50, 19 N.E.2d 598, 602-03 (Ill. 1939) ("The court early recognized the difficulty of laying down a comprehensive definition of the term 'corporate purpose,' . . . . [T]he true doctrine is, that corporate purposes are such purposes, and such only, as are germane to the objects to the creation of the municipality . . . .") A public purpose, similarly, is a purpose that "subserves the public interest and benefits a private individual or corporation only

The ILPCC Lease Agreement provides for a six-year term. If 65 ILCS § 5/11-76-6 applies, the five-year term language of that provision appears to render it unenforceable. *See Ad-Ex*, 207 Ill. App. at 163, 565 N.E.2d at 673. The fact that Lyon has already performed on the contract would not change this conclusion. *See Elk Grove Twp.*, 228 Ill. App. at 228, 592 N.E.2d at 553. Further, although a municipality may be equitably estopped from avoiding enforcement of an invalid contract under "extraordinary and compelling circumstances," *Patrick Engineering Inc. v. City of Naperville*, 364 Ill. Dec. 40, 52, 976 N.E.2d 318, 330 (Ill. 2012), the application of this doctrine is limited to situations where "the municipality has the power to enter into the contract, but where a portion thereof may be beyond its power, or its power may have been irregularly exercised," *Stahelin v. Board of Ed., School Dist. No. 4, DuPage County*, 87 Ill. App. 2d 28, 41-42, 230 N.E.2d 465, 472 (2d Dist. 1967). A contract which is "expressly prohibited by law," however, is *ultra vires* and "may not be rendered valid thereafter by estoppel or ratification on the part of the municipality." *Id.*

Although it does not appear that equitable estoppel would apply in this case, the court recognizes the troubling policy implications of allowing the Village to enter into the Lease Agreement and then unilaterally declare it void. All parties had an obligation to determine the legalities of the deal they were entering into, but the Village was presumably in the best position to understand the complicated provisions of Illinois law that govern municipal leases and contracts. In September and October 2009, the Village notified Lyon and Illinois Paper that the ILPCC Lease Agreement was void and unenforceable under the Illinois Municipal Code. The Village nevertheless proceeded to execute a document in November 2009 confirming Illinois Paper's buyout of the COTG Lease. Perhaps the Village believed at this time that the Lease Agreement could be salvaged by efforts to reform the agreement. Whatever the Village's motivations may have been for accepting Illinois Paper's final payment in November 2009 after

incidentally." *City of Rolling Meadows v. Nat'l Advert. Co.*, 228 Ill. App. 3d 737, 746, 593 N.E.2d 551, 558 (1st Dist. 1991). The court thus assigns little weight to this language as a way to distinguish 65 ILCS § 5/11-76-6 and 65 ILCS § 5/11-76.1-1.

already having determined that the Lease Agreement was unenforceable, however, the inequities of permitting the Village to avoid its obligations under the ILPCC Lease Agreement after Lyon and Illinois Paper relied on the Village's actions to their detriment are not lost on the court.

## III.    Other Statutory Language

Because disputes of fact preclude a determination of whether the Lease Agreement is a true lease, summary judgment is inappropriate, regardless of which statutory provision is applicable. And, if the apparent conflict between the statutory provisions discussed above were not enough, the court also notes the potential impact of yet another Municipal Code provision, one that the parties themselves have not addressed: 65 ILCS § 5/11-61-3 governs both leases and installment purchase agreements, and provides that:

> [t]he corporate authorities of each municipality having a population of less than 1,000,000 inhabitants shall have the express power to purchase or lease either real estate or personal property for public purposes through contracts which provide for the consideration for such purchase or lease to be paid through installments to be made at stated intervals during a certain period of time, but, in no case, shall such contracts provide for the consideration to be paid during a period of time in excess of 20 years . . . .

The court recognizes that the statutory provision Illinois Paper prefers (65 ILCS § 5/11-76.1-1) also appears to govern a municipality's power to enter into an installment purchase agreement for personal property. Perhaps the most obvious difference between the two statutory provisions is that 65 ILCS § 5/11-61-3 applies to municipalities having a population of less than 1,000,000, while 65 ILCS § 5/11-76.1-1 applies only to municipalities having a population of less than 500,000. In this case, however, the Village had a population of less than 500,000 in 2008, and thus both provisions could apply. (*See* Ill. Paper SUF ¶ 18.)

The court nevertheless believes the parties must address the possibility that 65 ILCS § 5/11-61-3 governs the ILPCC Lease Agreement.[17] First and most importantly, as the Village and Lyon argue, the ILPCC Lease Agreement was not passed by an ordinance. While 65 ILCS § 5/11-76.1-1 gives municipalities "the power by ordinance" to purchase or lease personal property, 65 ILCS § 5/11-61-3 provides municipalities with the power to purchase or lease personal property without passage of an ordinance. Second, the ILPCC Agreement required the Village to pay Lyon in monthly, not annual, installments. The provision Illinois Paper prefers, 65 ILCS § 5/11-76.1-1, applies specifically to leases and purchases paid in annual installments, whereas 65 ILCS § 5/11-61-3 applies more generally to leases and purchases paid through "installments to be made at stated intervals during a certain period of time." Third, 65 ILCS § 5/11-61-3 was adopted in 1999 and 65 ILCS § 5/11-76.1-1 was adopted in 1988, and where two statutory provisions relate to the same subject, Illinois courts "presume that the legislature intended the more recent statutory provision to control." *Moore v. Green*, 219 Ill. 2d 470, 480, 848 N.E.2d 1015, 1021 (Ill. 2006) (citing *State v. Mikusch*, 138 Ill.2d 242, 254, 562 N.E.2d 168 (Ill. 1990)).

If 65 ILCS § 5/11-61-3 governs, the ILPCC Lease Agreement may be enforceable whether it is understood as a true lease or as a purchase agreement, because the Village's execution of the Agreement complied with all of the statutory requirements. As mentioned above, the Village has a population of less than 1,000,000 as required under the statute, and the ILPCC Lease Agreement provided for installments to be made through stated (monthly) intervals for a certain period of time not exceeding twenty years. The court will expect the parties to address whether this provision is applicable in any further proceedings.

---

[17] The only reference to 65 ILCS § 5/11-61-3 in the existing briefs is a passing reference in the Village's Reply. Specifically, the Village contends that "Illinois law [ ] allows for the execution of multi-year contracts, for example: . . . Installment contracts up to a term of 20 years for the purchase or lease of real or personal property (65 ILCS § 5/11-61-3)." (Village Reply at 8.)

**IV.    Statute of Limitations**

The final issue in this case is whether any of the claims Lyon may seek to pursue are timely.  This issue, too, turns in part on whether the ILPCC Lease Agreement is deemed a sale or a true lease.

The Village breached the ILPCC Lease Agreement on or around September 2010. (Letter from Janet King, Collateral Recovery Specialist, U.S. Bancorp, to Village of Bensenville, Re: Notice of Disposition of Collateral, Aug. 25, 2010, Ex. A to Village SUF.)  Lyon filed its Amended Complaint, asserting a breach-of-contract claim against the Village, in December 2014.  (Am. Compl.)  The Village did not file an Answer to Lyon's Amended Complaint, and it did not raise any affirmative defenses in its motion to dismiss or first motion for summary judgment.  Instead, the Village argues for the first time in its amended motion for summary judgment that Lyon's breach-of-contract claim is barred by the four-year statute of limitations set forth in Article 2A of the Illinois Uniform Commercial Code, 810 ILCS § 5/2A-506, for actions on leases.  (Village Mot. at 5-6.)  Because Lyon waited more than four years to sue the Village after the accrual of its cause of action, the Village asserts, Lyon's claim is now barred.  (*Id.*)  In response, Lyon argues that the Village waived the statute-of-limitations defense by failing to raise it either in an answer or responsive pleading.  (Lyon Resp. to Village Mot. at 3.)

"Federal Rule of Civil Procedure 8(c) requires a defendant to include affirmative defenses like statute of limitations in its answer[.]"  *Williams v. Lampe*, 399 F.3d 867, 870-71 (7th Cir. 2005); *see* FED. R. CIV. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . statute of limitations.").  The Village did not file an answer to the complaint, despite being directed to do so within twenty-one days after January 28, 2015.  Nor did the Village raise the statute of limitations in its motion to dismiss.  To the contrary, counsel for the Village expressly conceded in open court that Lyon's breach-of-contract claim was timely.  The Village's original motion for summary judgment filed on February 18, 2015 made no mention of the statute of limitations.  The Village

raised the statute-of-limitations defense for the first time on July 29, 2015 in its amended motion for summary judgment.

The Village's failure to comply with Rule 8(c) by itself may not constitute a basis for finding that the statute-of-limitations defense is forfeited. "The purpose of [Rule 8(c)] . . . is to avoid surprise and undue prejudice to the plaintiff by providing her notice and the opportunity to demonstrate why the defense should not prevail." *Venters v. City of Delphi*, 123 F.3d 956, 969 (7th Cir. 1997). Accordingly, "[t]he failure to plead an affirmative defense in the answer [generally] works a forfeiture only if the plaintiff is harmed by the defendant's delay in asserting it." *Garofalo v. Village of Hazel Crest*, 754 F.3d 428, 436 (7th Cir. 2014) (quoting *Matthews v. Wis. Energy Corp., Inc.*, 642 F.3d 565, 570 (7th Cir. 2011)). It is thus within the district court's "discretion to allow an answer to be amended to assert an affirmative defense not raised initially." *Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005) (citing FED. R. CIV. P. 15(a); *Jackson v. Rockford Housing Auth.*, 213 F.3d 389, 392-93 (7th Cir. 2000)).

In this case, however, the court is unwilling to ignore the Village's failure to raise the defense earlier. By raising the statute-of-limitations argument for the first time in its amended motion for summary judgment after previously acknowledging that Lyon's claim was timely, and by failing to raise the defense in either an answer or its earlier motions, the Village deprived Lyon of a reasonable opportunity to address the defense. *See id.* at 968. The Village contends that "there is [no prejudice] to Lyon which has had full knowledge of the facts . . . and should have known of the statute of limitations applicable in this instance." (Village Mot. at 8-9.) In light of the Village's own failure to flag the issue and its affirmative disavowal of the defense, as well as the confusion surrounding the nature of the agreement, this argument is not compelling. As the Seventh Circuit explained in *Venters*,

> We recognize that the limitation defense may have been meritorious; and [plaintiff's] counsel should have had some inkling that the defense might be raised . . . . But it was not [plaintiff's] obligation to raise the defense, and if Rule 8(c) is not to become a nullity, we must not countenance attempts to invoke such

defenses at the eleventh hour, without excuse and without adequate notice to the plaintiff.

123 F.3d at 696. Contrary to the Village's assertion (Village Mot. at 8), discovery was not necessary for the Village to become aware of a potential statute-of-limitations defense; if, as the Village asserts, the parties' agreement was a true lease, then the availability of the defense would have been apparent when Lyon's initial complaint was filed. The Village has had the Lease Agreement in its possession since at least 2010, and was well aware of the date it allegedly breached the agreement by declaring it void. The Village's explanation for its delay is simply inadequate.

In sum, considering all of the circumstances—the Village's having declined to file an answer, its acknowledgment that Lyon's claim was timely, and its failure to raise the statute-of-limitations defense in its motion to dismiss or original summary judgment motion, despite having all the information to do so—the court finds that the Village has waived the defense.

## CONCLUSION

For the reasons discussed above, the parties' motions for summary judgment are denied. Factual disputes regarding the nature of the ILPCC Lease Agreement prevent the court from determining whether the agreement is enforceable under Illinois law and thus whether the Village or Illinois Paper is liable to Lyon for breach of contract. If the Lease Agreement is a true lease, 65 ILCS § 5/11-76-6 may render it unenforceable. On the other hand, it may be enforceable, whether viewed as a sale or as a lease, under other statutory provisions, including one the parties have not yet addressed. Regarding the Village's assertion that Lyon's claim against it is barred by the statute of limitations, this defense has been waived. The parties' motions for summary judgment [142, 144, 163] are denied.

ENTER:

_____

REBECCA R. PALLMEYER
United States District Judge

January 13, 2016