**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LYON FINANCIAL SERVICES, INC. d/b/a, US BANCORP BUSINESS EQUIPMENT FINANCE GROUP, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 10 C 7064 |
| ILLINOIS PAPER AND COPIER COMPANY and VILLAGE OF BENSENVILLE, | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

In 2008, the Village of Bensenville ("the Village") decided to replace its copier equipment. Village officials met with a supplier, Illinois Paper and Copier Company ("Illinois Paper"), but did not purchase the equipment directly from Illinois Paper. Instead, the parties arranged a transaction in which Lyon Financial Services, a subsidiary of U.S. Bank ("Lyon"), provided financing. The transaction ultimately consisted of two parts: Lyon purchased more than $500,000 worth of copier equipment from Illinois Paper pursuant to a contract called the "Partnership Agreement." Lyon then provided the copier equipment to the Village for 72 monthly payments of $9,500.00 under a "Value Lease Agreement" (the "Lease Agreement"). Critically, in the Partnership Agreement, Illinois Paper guaranteed to Lyon that the Lease Agreement was "valid and fully enforceable." But by the end of 2009, the Village declared that the Lease Agreement was unenforceable under relevant provisions of Illinois law. This declaration came after the Village had made only 19 payments on the agreement, but the copiers had lost 95% of their resale value—rendering Lyon unable to mitigate its losses. Lyon sued Illinois Paper in November 2010 for breach of contract. After four years of litigation, Lyon added a count, in the alternative, for breach of contract against the Village.

This $500,000 dispute has been thoroughly litigated and has generated rulings from the Seventh Circuit, the Supreme Court of Minnesota, and this court. The parties' final summary judgment motions are before the court. For the reasons below, the court grants the Village's motion for summary judgment, and grants in part Lyon's motion for summary judgment to recover interest from Illinois Paper which exceeded the Village's authority to agree to pay.

## BACKGROUND

### I.    Factual background

The facts and procedural history of this matter are set forth in an earlier summary judgment opinion.  *See Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, No. 10 C 7064, 2016 WL 147654, at *1–10  (N.D. Ill. Jan. 13, 2016).  As explained there, the parties dispute the nature of the agreement by which the Village of Bensenville obtained copiers and related equipment.  In October 2008, the Village executed a document entitled "Value Lease Agreement" (Village of Bensenville's LR 56.1 Statement of Material Facts (hereinafter "Village SOF") [237-1], at ¶ 6), which purports to be a lease agreement in which U.S. Bancorp Equipment Finance Group leased copiers to the Village in return for 72 monthly payments of $9,500.00.  (Value Lease Agreement (hereinafter "Lease Agreement"), Ex. 2 to 2d Am. Compl. [219-1], at 1.)  The agreement by its terms gives the Village the option to purchase the equipment at the end of the contract term for the equipment's "fair market value."  *Id.*  Lyon Financial Services, the plaintiff in this matter, is a subsidiary of U.S. Bank, and where the agreements refer to U.S. Bank or U.S. Bancorp, Lyon is the party in interest.[1]  The Lease

---

[1]    Lyon Financial, a Minnesota corporation headquartered in Marshall, Minnesota, is a financial services firm specializing in business-equipment financing.  Lyon is a subsidiary of U.S. Bancorp and does business as U.S. Bancorp Business Equipment Finance Group.  By virtue of a corporate merger effective January 1, 2012, U.S. Bank is the successor in interest to U.S. Bancorp Equipment Finance, Inc., which, by virtue of a separate corporate merger dated January 1, 2011, was the successor in interest to Lyon Financial Services, Inc. d/b/a U.S. Bancorp Business Equipment Finance Group.  (2d Am. Compl. [219], at ¶ 1.)  Following the parties' lead, this court refers to Lyon and its successors as "Lyon" throughout.

Agreement identifies Illinois Paper and Copier Company as the "supplier" of the equipment. (Lease Agreement at 1.)

During a Special Village Board of Trustees Meeting on October 27, 2008, the Village President and Village Board approved Resolution No. R-165-2008, entitled "A Resolution Authorizing the Execution of an Agreement with Illinois Paper and Copier, Inc. for Certain Photocopier Services." (*See* Resolution No. R-165-2008, Ex. 3 to Illinois Paper Statement of Undisputed Facts [233-3].) The same day, Village Manager James Johnson executed the Lease Agreement on behalf of the Village. (Lease Agreement at 1.) Lyon countersigned the Lease Agreement in December 2008. (Lyon Statement of Additional Undisputed Facts (hereinafter "Lyon SOF") [244 at p. 7],[2] at ¶ 2).

Just a few days earlier, on October 20, 2008, Lyon and Illinois Paper had entered into an agreement entitled "Partnership Agreement." (Ex. 1 to 2d Am. Compl. [219-1], at 1.) The Partnership Agreement does not explicitly contemplate the Lease Agreement, but does refer to one or more "lease transactions" that might be presented by Illinois Paper to Lyon (*id.* at 1), for which Lyon agreed to provide funding. (*Id.* at 2.) Central to this case, the Partnership Agreement contains the following term:

> **Representations and Warranties**: . . . . You [Illinois Paper] represent and warrant that all lease transactions presented to US Bancorp for review are valid and fully enforceable agreements. . . . You agree to indemnify and hold U.S. Bancorp harmless from any loss or claim resulting from you[r] breach of the foregoing representations and warranties.

(Partnership Agreement at 2) (emphasis in original). Pursuant to the Partnership Agreement, Lyon purchased copier equipment from Illinois Paper, with a check dated December 12, 2008, for $510,658.19. (Lyon SOF ¶ 3.) Then, pursuant to the Lease Agreement, the Village received the copier equipment (the record does not disclose, exactly, when or from whom) and began making payments shortly thereafter. Though the Partnership Agreement refers to the possibility

---

[2] Where a document or exhibit was provided to the court in a group of documents under a single docket number, the bracketed portion of the citation contains the docket number followed by the first page on which the exhibit appears in the group as a whole.

3

that Lyon would present other "lease transactions" to Illinois Paper, it is undisputed that this was the only transaction Illinois Paper engaged in that involved Lyon.

In September 2009, Village authorities determined that the Village lacked the power, under Illinois law, to have executed the Lease Agreement.  (Village SOF ¶ 15.)  Who made this determination, or what prompted it, is not disclosed in the record.  The Village Board and manager initially believed that 65 ILCS § 5/11-76-6 provided the authority for the transaction.  (*See* Letter from Sean Conway, Counsel for Village of Bensenville, to Troy Kepler, Law Dep't, Lyon Financial Services (Sept. 25, 2009), Ex. B. to Village SOF [237-1 at p. 13], at 1.)  The statute, however, only provides authority for lease transactions "not to exceed 5 years . . . .," 65 ILCS § 5/11-76-6.  Village officials concluded that the 72-month (six-year) term of the Lease Agreement exceeded the Village's authority under Illinois law.  Sean Conway, the Village's attorney, notified one of Lyon's attorneys, Troy Kepler, of this opinion in September 2009.  (Village SOF ¶ 15.)  The attorneys for Lyon and the Village attempted to negotiate a legally enforceable reformation of the Lease Agreement until the following summer, but ultimately, Mr. Conway notified Mr. Kepler on June 1, 2010 that the Village intended to make no further payments after the July 2010 payment.  (Village SOF ¶¶ 18–19.)  The Village made a total of 19 payments of $9,500.00 each, but did not make the payment due on August 27, 2010 or any payment thereafter.  (Lyon SOF ¶ 6.)  On August 25, 2010, Janet King, a Collateral Recovery Specialist at Lyon, notified the Village in a letter addressed to the Village's former manager, James Johnson, of Lyon's intent to recover the equipment (Village SOF ¶ 29), and shortly thereafter Lyon repossessed and resold the equipment for $18,956.25.  (Lyon SOF ¶ 7.)  Lyon incurred $4,296.00 in repossession fees, resulting in a net recovery of just $14,660.25.  (*Id.*)

Though the repossession letter from Lyon stated that it would hold the Village responsible for the deficiency under the Lease Agreement (*see* Village SOF ¶ 29), both Lyon and the Village adopted the position that the agreement was, in fact, unenforceable.  (*See* Village SOF ¶ 30.)  Sean Conway, the Village's attorney, confirmed the parties' positions in

4

response to the repossession letter, notifying Ms. King that he had spoken with Lyon's attorney, Mr. Kepler, who represented that Lyon would not seek payment from the Village. (Letter from Sean Conway to Janet King (Sept. 2, 2010), Ex. B to Village SOF [237-1 at p. 21], at 1; *see* Village SOF ¶ 30.)

Instead of contesting the Village's refusal to satisfy the obligation, Lyon turned to Illinois Paper, demanding enforcement of Illinois Paper's guarantee that the Lease Agreement with the Village was enforceable. Thus, in a letter dated July 19, 2010, another of Lyon's attorneys, Alex Darcy, demanded that Illinois Paper "repurchase" the Lease Agreement pursuant to the guarantee in the Partnership Agreement. (Letter from Alex Darcy, Counsel for Lyon, to Terry Yormark, President of Illinois Paper, Ex. F to Village SOF [237-1 at p. 40].) Ronald Panter, counsel for Illinois Paper, responded on August 5, 2010 that Illinois Paper would not repurchase the Lease Agreement for several reasons, one of which was that the demand was premature, as Lyon had neither sought nor received any judicial determination that the Lease Agreement was, in fact, unenforceable. (Letter from Ronald Panter to Alex Darcy, Ex. H to Village SOF [237-1 at p. 43], at 2.)

## II.    Litigation history

Lyon filed suit against Illinois Paper on November 2, 2010 for breach of contract. (Compl. [1].) Illinois Paper raised counterclaims of fraud, breach of fiduciary duty, and breach of contract, which Judge Hibbler—the judge initially assigned to this matter—dismissed. (May 4, 2011 Mem. Op. and Order [44].) Illinois Paper then moved for judgment on the pleadings, on the grounds that Illinois Paper's guarantee of the legal enforceability of the Lease Agreement could not form the basis of a breach of contract or breach of warranty claim under Illinois law because it was a representation of law, not fact. (Mot. for J. on Pleadings [45].) Judge Hibbler agreed and granted the motion. *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, No. 10 CV 7064, 2012 WL 401493, at *2 (N.D. Ill. Feb. 6, 2012). Lyon appealed that decision, arguing that the court had erred in determining that Illinois law, rather than Minnesota law, applied to the

Lease Agreement, and that a representation of law could form the basis of a breach of contract action. The Seventh Circuit agreed with Lyon that Minnesota law governs the Lease Agreement, *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 732 F.3d 755, 758–59 (7th Cir. 2013), but declined to decide whether the representation of law was actionable in breach of contract. *Id.* at 765–66. Instead, the court certified that question to the Minnesota Supreme Court. *Id.* at 767. The Minnesota Supreme Court answered in the affirmative, concluding that a representation of legal enforceability can be the basis for a breach of contract claim, even if the injured party did not rely on that representation. *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 848 N.W.2d 539, 545–46 (Minn. 2014). The Seventh Circuit accordingly reversed the judgment on the pleadings and remanded to this court. *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 577 F. App'x 606, 607 (7th Cir. 2014).

Lyon filed an amended complaint on December 12, 2014, alleging breach of contract against Illinois Paper and, for the first time, breach of contract against the Village in the alternative—if the Lease Agreement was, in fact, enforceable. (Am. Compl. [114], at ¶¶ 17–22.) Illinois Paper raised several affirmative defenses in its Amended Answer: (1) that Lyon's claims were premature because there had been no determination that the Lease Agreement was unenforceable, (2) that the Lease Agreement was enforceable under Illinois law, (3) that the Village is estopped from denying the enforceability of the Lease Agreement, (4) that Lyon is barred from recovery because it caused the breach, and (5) that Lyon purchased the equipment having full knowledge of the facts, barring recovery under the voluntary payment doctrine. (Ill. Paper. Am. Ans., Aff. Defenses, Third Party Claim [115 at p. 7], at ¶¶ 24–29.) Illinois Paper also asserted third-party claims against the Village for "quasi-contract" and unjust enrichment. (*Id.* ¶¶ 30–34.)

The Village moved to dismiss Lyon's breach of contract claim and Illinois Paper's claims against it. (Village Mot. to Dismiss [116], at 3.) At a January 28, 2015 hearing on that motion, the court asked counsel for the Village whether Lyon's breach of contract claim was barred by

the statute of limitations.  (Tr. of Proceedings (Jan. 28, 2015) [164], at 6:23–24.)  The Village's counsel responded: "In my opinion, your Honor, I have not raised a statute of limitations because what they are bringing is a contract claim."  (*Id.* at 6:25–7:2.)[3]  The court granted the Village's motion to dismiss Illinois Paper's third-party claims on other grounds: Judge Hibbler had previously dismissed claims made by Illinois Paper against the Village and Illinois Paper had failed to appeal, precluding further claims against the Village.  (Order (Jan. 28, 2015) [121], at 1.)  The court denied the Village's motion to dismiss Lyon's claim, however.  The Village had argued that Lyon's claim against it was inconsistent with its allegations against the Village, but the court concluded that Lyon was permitted to pursue inconsistent litigation positions.  (*Id.*)  The court noted, further, that though "Lyon Financial Services, Inc. did not file any claims against the Village prior to the appeal . . . the Village acknowledges that Lyon's claims, if otherwise cognizable, are timely."  (*Id.*)  The court ordered Illinois Paper and the Village to respond to the amended complaint within 21 days.  (*Id.*)

The Village did not file an answer, instead filing a motion for summary judgment on February 15, 2015 (Village Mot. for Summ. J. [122]), and amending it in July 2015.  (Village Am. Mot. for Summ. J. [163].)  In the July 2015 amendment, the Village raised a statute of limitations defense for the first time, arguing that Lyon's claim was barred by the four-year Uniform Commercial Code (UCC) statute of limitations on leases, codified at 810 ILCS 5/2A-506. (Village Mem. in Supp. of Mot. for Summ. J [163-1], at 5–6.)  Lyon defended the timeliness of its claim, arguing that (1) the Village had waived the defense by failing to raise it, (2) that the Village was estopped from asserting the defense, (3) that the statute of limitations should be equitably tolled during the period the case was on appeal, and (4) that the applicable statute of limitations is the ten-year limitation for contracts, not the UCC statute of limitations for leases. (Lyon Resp. to Village Am. Mot. for Summ. J. [172], at 3.)

---

[3]        The general statute of limitations for breach of a written contract in Illinois is ten years.  735 ILCS § 5/13-206.

Illinois Paper and Lyon moved for summary judgment as well. Illinois Paper argued that the agreement was enforceable because it was not a lease and therefore not barred by the five-year limitation on the municipal power to lease equipment under 65 ILCS § 5/11-76-6. (Illinois Paper Mot. for Summ J. [142], at 2–3). Illinois Paper alternatively argued that the Lease Agreement could be enforced under 65 ILCS § 5/11-76.1-1, which allows municipalities to purchase or lease property by ordinance where the consideration is paid in annual installments.[4] (*Id.* at 3–9.) Lyon contended, in its motion for summary judgment, that if the Lease Agreement is unenforceable, Lyon is entitled to summary judgment against Illinois Paper on a claim of breach of the guarantee. In the alternative, if the Lease Agreement is enforceable, Lyon urged, it was entitled to summary judgment against the Village for breach of that agreement. (Lyon Resp. to Village Am. Mot. for Summ. J. at 1–2.)

The court denied these summary judgment motions. *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 10 C 7064, 2016 WL 147654, at *18 (N.D. Ill. Jan. 13, 2016). First, the court found that the enforceability of Illinois Paper's guarantee depended on an unresolved issue of fact. The UCC provides a test for whether an agreement that is in the form of a lease is a true lease or is, in fact, a disguised secured sale transaction. 810 ILCS § 5/1-203. Under that test, the court observed that the Lease Agreement—which provides an option for the Village to purchase at the end of the contract term—may be a secured transaction if the value of the copiers at the end of the term is nominal. *Lyon Fin. Servs., Inc.*, 2016 WL 147654, at *13. Such a result was a genuine possibility, in light of the fact that the copiers had already lost 95% of their value in less than two years. *Id.* at *13–14. Second, the court was not certain that the Lease Agreement is unenforceable, even if it is deemed a lease. The court noted a statutory

_____

[4] "The corporate authorities of each municipality having a population of less than 500,000 inhabitants have the power by ordinance adopted by an affirmative vote of two-thirds of the elected corporate authorities then holding office:
    (i) To purchase or lease real or personal property for public purposes pursuant to contracts or leases which provide for the consideration for such purchase or lease to be paid in annual installments during a period not exceeding 20 years . . . ."

provision, 65 ILCS § 5/11-61-3, that the parties did not address. That provision appears to authorize municipalities to lease or purchase goods on an installment contract. *Id.* at *17. Finally, the court denied the Village's motion for summary judgment on the statute of limitations, on the ground that the Village had waived the defense by failing to raise the argument in an answer, in its motion to dismiss, or in its initial summary judgment motion, and had affirmatively represented to the court that there was no statute of limitations defense available to it. *Id.* at *17–18.

The Village moved the court to reconsider its ruling on waiver (Village Mem. in Supp. of R. 59(e) Mot. [198], at 3–11), and without explicitly granting that motion, the court permitted the Village leave to re-plead the statute of limitations in an answer. (Tr. of Proceedings (Jan. 12, 2016) [215], at 4:15–18.) After Lyon filed a second amended complaint, alleging that 65 ILCS § 5/11-61-3 did not authorize the Lease Agreement (2d Am. Compl. [219], at ¶¶ 12–13), the parties have again moved for summary judgment. Illinois Paper again argues that the Lease Agreement is not a "lease transaction" at all under the UCC test. Accordingly, Illinois Paper contends, the transaction does not fall within its guarantee in the Partnership Agreement (Illinois Paper Mot. for Summ. J. (hereinafter "Illinois Paper Br.") [231], at 1–6), and the lease is enforceable because the Village had authority to enter into it under 65 ILCS § 5/11-61-3, or alternatively, under other provisions of Illinois municipal law. (*Id.* at 6–14.) Lyon argues that the Lease Agreement is a lease (Lyon Resp. to Paper Mot. for Summ. J & Cross-Mot. (hereinafter "Lyon Br.") [245], at 4), or that the Partnership Agreement guarantee covers the Lease Agreement regardless of the nature of the agreement. (*Id.* at 5–10). Lyon contends that the Lease Agreement is unenforceable because the Village had no authority to execute it under Illinois law. (*Id.* at 11–23.) In the alternative, if the Lease Agreement is enforceable, Lyon requests summary judgment against the Village on its breach of contract claim. (*Id.* at 23.) The Village, for its part, argues that Lyon should be prevented from pursuing the claim against it by operation of the statute of limitations or other equitable considerations (Village Mem. of Law in

Supp. of Summ. J (hereinafter "Village Br.") [239], at 2–8, 14–21), that the Lease Agreement is unenforceable (*id.* at 8–13), and, in the alternative, that Lyon's requested damages must be reduced because Lyon failed to mitigate.  (*Id.* at 21–22.)

For the reasons below, the court finds that the Lease Agreement is a sale under the UCC, but that Illinois Paper's guarantee applies to it because it is the only such agreement to which the Partnership Agreement guarantee could refer.  The court concludes, further, that the Lease Agreement is enforceable under 735 ILCS § 5/11-61-3, but only to the extent of the Village's authority to contract.  Finally, Lyon's claims against the Village itself are barred by the statute of limitations.

## DISCUSSION

Summary judgment is appropriate where the movant has demonstrated that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th Cir. 2015).  A dispute over a fact is genuine if a reasonable jury could find for the non-moving party on the evidence before the court.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The non-moving party "must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial."  *Life Plans*, 800 F.3d at 349 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

The court concludes that the agreement between the Village and Lyon, titled a "Lease Agreement," is, under the Uniform Commercial Code (adopted by Illinois, 810 ILCS § 5/1-101 *et seq.*), a secured transaction.  810 ILCS § 5/1-203.  Nevertheless, Illinois Paper's guarantee in the Partnership Agreement unavoidably covers the Lyon-Village agreement, because the plain intention of the parties was for Illinois Paper to guarantee the Lyon-Village agreement, regardless of the legal nature of that agreement under the UCC.  The Lease Agreement is partially unenforceable, but only to the extent that the interest charged by Lyon on the sale exceeded the limits of 65 ILCS § 5/11-61-3.  Otherwise, the Village would receive a windfall.

Finally, the court agrees with the Village that Lyon's claim against the Village is barred by the statute of limitations, despite the Village's lack of diligence in asserting it, because Lyon has had a more than adequate opportunity to respond to the argument, and Lyon is significantly culpable in its delay in filing the claim against the Village.

**I.**      **The Lease Agreement is a secured transaction, but Illinois Paper nevertheless guaranteed its enforceability.**

The Uniform Commercial Code, which Illinois has adopted, recognizes a distinction between a lease and a secured transaction. 810 ILCS § 5/1-101 *et seq.*[5] This distinction is important; there is an entire provision dedicated to distinguishing the two, entitled "Lease distinguished from security interest." 810 ILCS § 5/1-203. The statute contemplates a situation where two parties enter into an agreement, fully intending it to be a lease, but where it is a secured transaction regardless:

> (b) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
>> (1) the original term of the lease is equal to or greater than the remaining economic life of the goods;
>> (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
>> (3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or
>> (4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

*Id.* Unlike most contract law, intent is not relevant to this assessment; the comments to the provision expressly disclaim it. *Id.* at cmt. 2 ("Reference to the intent of the parties to create a lease or security interest led to unfortunate results. . . . Accordingly, this section contains no reference to the parties' intent.")

---

[5]      Though interpretation of the Lease Agreement is governed by Minnesota law (Lease Agreement at 2), the Village's municipal authority to enter into it is a question of Illinois law, which Lyon does not contest. (Lyon Resp. to Village Mot. for Summ J. [257], at 2.)

It is the first and fourth factors that concern the parties here. In its previous opinion, this court identified a dispute of fact regarding the expected value of the equipment at the end of the lease term. *Lyon Fin. Servs., Inc.*, 2016 WL 147654, at *14. If the value of the copiers was nominal, factor 1 would apply because the term of the lease exceeded their economic life. Given the Village's option to purchase the copiers for "fair market value," a conclusion that the copiers have a fair market value of zero would similarly trigger factor 4. Both of these tests are met: The parties have agreed that the value of the goods at the end of the lease term would be nominal. (Illinois Paper Statement of Undisputed Facts (hereinafter "Illinois Paper SOF") [233], at ¶ 4; Lyon Resp. to Illinois Paper SOF [244], at ¶ 4 (conceding value would be less than 10% of original cost).) Even if there is a dispute about whether the value of the copiers would be "nominal" within the meaning of the statute, the value would unquestionably be less than the value of performance under the agreement at the end of the term. *See* 810 ILCS § 5/1-203(d) (defining nominal value). If the Village chose not to buy the equipment, alternative performance under the agreement would require the Village to relocate the equipment at the Village's expense. (Lease Agreement at 2.) The price that Lyon paid to relocate the equipment was $4,296.00. (Lyon SOF ¶ 7.) Given that the equipment was worth less than 5% of the $510,000 purchase price after 19 months of use (selling for just under $19,000), the court expects that the equipment's value would dip below the price of alternative performance.

Lyon and the Village advance several arguments as to why the agreement should nevertheless be considered a lease. First, Lyon points to a "non-appropriation" clause in the Lease Agreement, which terminates the agreement in the event that (a) the Village fails to appropriate funds for the monthly payments and (b) there is no other legal avenue by which payment can be made to Lyon. (Lease Agreement at 2.) That clause, Lyon asserts, is an optional termination provision that obviates the possibility that the agreement is a secured transaction. (Lyon Br. 4–5). Lyon urges the court to reconsider its prior decision on this issue, *Lyon Fin. Servs., Inc.*, 2016 WL 147654, at *12–13 (finding non-appropriation clause was not a

termination clause).  Second, Lyon argues that the plain intent of all the parties involved at the outset was to form a lease agreement.  Third, Lyon contends that this agreement could be fairly termed a "capital lease," or a "finance lease," drawing it into the scope of a "lease" that Illinois Paper set out to guarantee.

The court is not convinced by the recapitulation of Lyon's argument that the agreement is terminable due to the non-appropriation clause.  It is true, under the Illinois Commercial Code, that if the option to terminate an agreement exists, the agreement is not a secured transaction.  801 ILCS § 5/1-203(b).  Lyon argues that the non-appropriation clause gives the Village the ability to terminate the Lease Agreement, and advances *Dieck v. Unified School District of Antigo*, 157 Wis. 2d 134 (Wis. Ct. App. 1990); *Mayhew Tech Center, Phase II v. County of Sacramento*, 4 Cal. App. 4th 497, 502, 515 (Cal Ct. App. 3d Dist. 1992); *Employers Insurance Co. of Nevada v. State Board of Examiners*, 21 P.3d 628, 633 (Nev. 2001); and *Business Computer Rentals v. State Treasurer*, 953 P.2d 13, 17–18 (Nev. 1998) for this point.  These are the very same cases originally cited to the court before it ruled on this issue, and Lyon has added nothing to the argument.  The court stands by its determination that the non-appropriation clause in the Lease Agreement is not a termination clause, *Lyon Fin. Servs., Inc.*, 2016 WL 147654, at *12–13; it is an effort to avoid a provision of Illinois law that prevents today's leaders of a municipal government from irrevocably binding their successors.  *See* 65 ILCS § 5/8-1-7.  Put another way, the provision reflects Lyon's effort to render the agreement irrevocable to the greatest extent possible, without rendering it unenforceable under Illinois law.  This is not a "meaningful right of termination."  *See In re Nationwise Automotive, Inc.*, 250 B.R. 900, 904 (Bankr. S.D. Ohio 2000) (discussed at length in the court's original opinion).

Again, the parties' intent, though normally of central importance in contract law, is not relevant to the determination of whether an agreement is a secured transaction or a lease under the Uniform Commercial Code.  Each prong in the statutory test is purely objective.  810 ILCS § 5/1-203.  The comments to § 5/1-203 explain specifically that it was crafted to remove any

"reference to the parties' intent."  810 ILCS § 5/1-203 cmt. 2.  Though the parties may well have intended the agreement to be a lease, their intent is irrelevant for these purposes.  Objective factors establish that the agreement is a secured transaction.

Lyon points to several cases in which courts referred to secured transactions of this type as "capital leases."  Illinois Paper is unmoved by these citations, and observes that the Code could not be more clear in distinguishing between a lease and a secured transaction.  810 ILCS § 5/2A-103(1)(j) (defining lease as "a transfer of the right to possession and use of goods for a term in return for consideration, but . . . retention or creation of a security interest is not a lease.")  The cases Lyon cites do refer to agreements that would apparently qualify as secured transactions under 810 ILCS § 5/2-103—because the lessee can purchase the leased items for a nominal sum at the end of the lease term—as "capital leases."  *Cargill, Inc. v. United States*, 91 F. Supp. 2d 1293, 1300 (D. Minn. 2000); *Shopko Stores Operating Co. v. Balboa Capital Corp.*, SACV 16-99-JLS, slip op. at 2 (C.D. Cal. Jun. 3, 2016) (Ex. A to Lyon Br. [245-1]).  The nature of the agreement was not at issue in *Shopko*, however, and the term is only used once.  *See Shopko*, slip op. at 2.  In *Cargill*, the nature of the agreement was at issue, but the case concerned the categorization of real property for federal tax purposes.  91 F. Supp. 2d at 1300.  In this case, concerning a transaction of goods, the meaning of the term "lease" is better interpreted by the Uniform Commercial Code.  810 ILCS § 5/2-102 (scope).

Though the parties' intent is not relevant to the question of whether the Lease Agreement is a lease or a sales contract under Illinois law, it is relevant to the meaning of the Partnership Agreement, which is governed by Minnesota law.  *See Lyon Fin. Servs., Inc.*, 732 F.3d at 758–59.  "The objective of judicial interpretation of disputed provisions of a contract is to ascertain and give effect to the parties' intention."  *Midway Ctr. Assocs. v. Midway Ctr., Inc.*, 306 Minn. 352, 356, 237 N.W.2d 76, 78 (1975) (citing *Hartung v. Billmeier*, 243 Minn. 148, 151, 66 N.W.2d 784, 788 (1954)).  The parties' intent is determined by the court "putting itself in the parties' positions at the time they formed the contract and determining what they reasonably

meant to accomplish in view of the contract as a whole, its plain language, and the surrounding circumstances." *Ecolab, Inc. v. Gartland*, 537 N.W.2d 291, 295 (Minn. Ct. App. 1995) (citing *Midway Ctr. Assocs.*, 306 Minn. at 356, 237 N.W.2d at 78). The court can consider contracts executed at the same time to determine the parties' intent. *Am. Nat'l Bank of Minnesota v. Hous. & Redevelopment Auth. for City of Brainerd*, 773 N.W.2d 333, 337 (Minn. Ct. App. 2009).

Considering both the Partnership Agreement and the transaction between Lyon and the Village, it is unavoidable that the intent of the Lyon-Illinois Paper agreement is to guarantee the enforceability of the Lyon-Village agreement. There is no other transaction to which it could refer. (Illinois Paper Resp. to Lyon SOF [253], at ¶ 9 ("Admitted that this was the only transaction in which Illinois Paper was the vendor of equipment that involved Lyon."); Dep. of Matthew Lichius, Ex. B to Lyon SOF [244-1 at p. 23], at 116:5–7 ("Q. As far as you know it's the only deal Illinois Paper ever did with US Bank? A. That's correct.").) Illinois Paper warranted "that all lease transactions presented to US Bancorp for review are valid and fully enforceable agreements . . . ." (Partnership Agreement at 2.) There were just two agreements in this transaction. Illinois Paper cannot avoid that the parties intended for Illinois Paper to guarantee that Lyon would be able to enforce the Lease Agreement.

Illinois Paper notes that Lyon was the drafter of the Partnership Agreement, and argues that Lyon should be held to its explicit terms. *See Untiedt v. Grand Labs., Inc.*, 552 N.W.2d 571, 574 (Minn. Ct. App. 1996) ("When faced with an ambiguous contract, we construe its terms against the drafter in the absence of a clear showing that the parties intended a contrary meaning."). Lyon perhaps should be faulted for drafting a guarantee that purports to cover leases, when it is in fact executing transactions in the nature of a secured sale. But it would defy the intent of the parties to allow Illinois Paper to avoid liability altogether under a guarantee for which the sole subject was completely clear to everyone involved. Furthermore, all parties thought that the Lease Agreement was a lease transaction, as the term "lease" appears in the title ("Value Lease Agreement") and the terms ("Lease Terms," "Lease Payment Amount").

(Lease Agreement at 1.)   Reading the two agreements in light of one another, it would be absurd to interpret "lease transaction" to exclude the only purported "lease transaction" that existed or which any party was contemplating.

Illinois Paper objects that, as a guarantor, it is allowed to "insist that [it be] bound to the extent, in [the] manner, and under the circumstances pointed out in [its] obligation, and no further." *Schmidt v. McKenzie*, 215 Minn. 1, 9, 9 N.W.2d 1, 5 (1943) (quoting *Simonson v. Grant*, 36 Minn. 439, 442, 31 N.W. 861, 862 (1887)).   Illinois Paper cites several cases in which the guarantor was found not liable for an agreement that was outside the guarantor's intent to guarantee.   (Illinois Paper Reply in Supp. of Mot. for Summ. J. (hereinafter "Illinois Paper Reply Br.") [254], at 6.)   Those cases do not militate a different outcome here, however.   *Schmidt*, the primary case Illinois Paper cites, concerns a situation in which the underlying agreement changed, after the guarantee was entered, by the actions of the two parties to the guaranteed contract.   215 Minn. at 11, 9 N.W.2d at 5–6.   In that case, an individual guaranteed a brewing company's obligation under a contract in which a distributor loaned the brewing company money to be paid back in the form of a quantity of half-price beer.   *Id.* at 4–5, 9 N.W.2d at 3. The brewing company was not able to supply the agreed amount of beer on the agreed date, but the distributor agreed to waive the requirement and purchase the beer at full price, applying nothing to the loan.   *Id.* at 5–6, 9 N.W.2d at 3.   The distributor then sued the guarantor for breach of the guarantee.   *Id.* at 2, 9 N.W.2d at 2.   The Minnesota Supreme Court affirmed dismissal of the claim, observing that the parties to the underlying contract had taken "a material departure from the terms of the contract as originally made," *id.* at 8, 9 N.W.2d at 5, creating a "new arrangement . . . wholly between the plaintiff and the company," without obtaining the guarantor's consent to that new arrangement."   *Id.* at 11, 9 N.W.2d at 5–6.   In contrast, no change in the underlying agreement occurred here, as both Lyon and Illinois Paper knew what transaction the Partnership Agreement referred to, and the transaction did not change.

Illinois Paper also relies on *Kittson County v. River Ridge Dairy, LLP*, No. A08-0381, 2008 WL 5215988 (Minn. Ct. App. Dec. 16, 2008), an unpublished decision of the Minnesota Court of Appeals. In *Kittson County*, the appellate court upheld a grant of summary judgment against a bank, which had sought to enforce a county's promise to guarantee a 72-month loan from the bank to a private dairy company. *Id.* at *1. The loan that the bank and the company made, however, was for one year. *Id.* The trial court found the county did not guarantee that loan, despite the fact that the loan was already executed when the county executed the guarantee agreement, and the appellate court upheld that decision, observing that the terms of the guarantee on the length of the loan period were not ambiguous. *Id.* at *2. *Kittson County* is distinguishable because the terms of the guarantee and the terms of the loan were radically different; here, Illinois Paper agreed to guarantee all "lease transactions" that it presented to Lyon, whatever the terms. There is no dispute that the lease transaction that Illinois Paper agreed to guarantee and the agreement that Lyon executed with the Village were one and the same. In any event, *Kittson County* is non-precedential. *Vlahos v. R&I Const. of Bloomington, Inc.*, 676 N.W.2d 672, 676 n.3 (Minn. 2004) (admonishing courts not to rely on unpublished decisions as precedent; to do so is erroneous as a "matter of law and as a matter of practice"); *Harnischfeger Corp. v. Harbor Ins. Co.*, 927 F.2d 974, 976 (7th Cir. 1991) ("A noncase for Wisconsin's own purposes is a non-case in federal courts under *Erie*.").

Illinois Paper also urges that indemnification agreements are to be narrowly construed, but the cases it cites all relate to the indemnification of construction negligence, *Nat'l Hydro Sys. v. M.A. Mortenson Co.*, 529 N.W.2d 690, 692 (Minn. 1995); *Mytty v. Johnson Constr., Inc.*, No. C9-99-639, 1999 WL 768352, at *1 (Minn. Ct. App. Sept. 28, 1999). Such agreements are particularly disfavored in Minnesota law and were banned altogether by statute in 1984. S*ee Braegelmann v. Horizon Dev. Co.*, 371 N.W.2d 644, 646 (Minn. Ct. App. 1985). The court is not convinced that this principle applies beyond the construction context. *See Buchwald v. Univ. of Minnesota*, 573 N.W.2d 723, 726 (Minn. Ct. App. 1998) (interpreting non-construction indemnity

contract without narrow construction, applying only "the principles generally applied in the . . . interpretation of other contracts.").

Finally, Illinois Paper cites a number of cases admonishing courts that plain language is the primary source of the parties' intent; where contract terms are clear and unambiguous, that language controls. *See Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004); *see also Telex Corp. v. Data Prods. Corp.*, 271 Minn. 288, 294–95, 135 N.W.2d 681, 686–87 (1965); *Seed v. Astra Genstar P'ship*, No. C2-02-1143, 2003 WL 178790, at *3 (Minn. Ct. App. Jan. 28, 2003); *Kellogg Square P'ship v. Prudential Ins. Co. of Am.*, 63 F.3d 699, 701–02 (8th Cir. 1995); *White v. Nat'l Football League*, 149 F. Supp. 2d 858, 860 (D. Minn. 2001) (applying NY law). The court finds that the subject of the guarantee in the Partnership Agreement is not clear, considering the contemporaneous agreement and what the parties "reasonably meant to accomplish." *See Ecolab, Inc.*, 537 N.W.2d at 295. Accordingly, the court adopts the interpretation that follows the parties' plain intent, which is that the term "lease transaction" includes this transaction that all parties believed, and would have referred to as, a lease.

## II.     The Village is estopped from evading the Lease Agreement to the extent that the agreement was within its powers to form.

Given that Illinois Paper guaranteed the enforceability of the Lease Agreement, the court now turns to the question of the Lease Agreement's enforceability against the Village. The Village adopted the position, 19 payments into the Lease Agreement's term, that it had exceeded its authority to enter into the Agreement in the first place. Lyon acquiesced in that position until almost four years into this litigation. Municipalities are "creatures of statute," and have only the powers conferred by the state. *See City of Springfield v. Judith Jones Dietsch Tr.*, 321 Ill. App. 3d 239, 242, 746 N.E.2d 1272, 1274 (4th Dist. 2001) (citing *Petterson v. City of Naperville*, 9 Ill. 2d 233, 243, 137 N.E.2d 371, 377 (1956)). Therefore, municipalities may only

enter into contracts to the extent a statute grants them authority to do so. *Meade v. City of Rockford*, 2015 IL App (2d) 140645, ¶¶ 28–29, 40 N.E.3d 141, 148.

Because the transaction between Lyon and the Village is not a lease, 65 ILCS § 5/11-76-6—permitting municipalities to enter into equipment leases not to exceed five years—does not provide the necessary authority to enter into the agreement. In its earlier opinion, however, the court identified another provision of Illinois law that may have provided the necessary authority: 65 ILCS § 5/11-61-3. *Lyon Fin. Servs., Inc.*, 2016 WL 147654, at *16–17. Illinois Paper now argues that it does. The statute reads in relevant part:

> The corporate authorities of each municipality having a population of less than 1,000,000 inhabitants shall have the express power to purchase or lease either real estate or personal property for public purposes through contracts which provide for the consideration for such purchase or lease to be paid through installments to be made at stated intervals during a certain period of time, but, in no case, shall such contracts provide for the consideration to be paid during a period of time in excess of 20 years nor shall such contracts provide for the payment of interest at a rate of more than that permitted in "An Act to authorize public corporations to issue bonds, other evidences of indebtedness and tax anticipation warrants subject to interest rate limitations set forth therein", approved May 26, 1970, as amended.

The parties agree that that the applicable interest rate to which the statute refers is 9% (Lyon Br. 12–13 (analyzing the relevant rate of interest under the Bond Authorization Act, 30 ILCS 305/2); *see* Illinois Paper Reply Br. 17), and that the Village had, at all relevant times, fewer than 1,000,000 people. (Lyon Resp. to Illinois Paper SOF [244], at ¶ 6.) Finally, *Bank of Pawnee v. Joslin*, an Illinois appellate court case, holds that municipal contracts authorized under § 5/11-61-3 must be approved by ordinance pursuant to 65 ILCS § 5/11-76.1-1. 166 Ill. App. 3d 927, 940, 521 N.E.2d 1177, 1186 (4th Dist. 1988). Though Illinois Paper argues vigorously that this holding was erroneous (Illinois Paper Reply Br. 13), the court does not have jurisdiction to overrule a holding of an Illinois appellate court and considers the ordinance requirement necessary.

A municipality may be estopped from denying the enforceability of a contract, however, even where it did not entirely comply with authorizing statutes. "[E]quitable estoppel is an

available defense against a municipality's attempt to avoid the terms of a valid agreement on the grounds it failed to comply with an applicable statute." *Humphrey Prop. Grp., LLC v. Village of Frankfort*, 925 N.E.2d 219, 223–24 (3d Dist. 2009). For estoppel to apply, "there must be an act by a municipality that induces reliance by a private party," and the reliance must be "detrimental and reasonable." *Patrick Eng'g, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 39, 976 N.E.2d 318, 331. "Where municipalities have received and accepted the benefits of a contract they are estopped to deny the validity of the very contract through which they received the benefits," *Mahoney Grease Serv., Inc. v. City of Joliet*, 85 Ill. App. 3d 578, 583, 406 N.E.2d 911, 915 (3d Dist. 1980), even where the contract was entered into through an "irregular exercise of authority," provided the municipality otherwise has authority to enter into such contracts. *Humphrey Prop. Grp.* at 224 (internal quotation marks omitted); *see also E. Peoria Cmty. High Sch. Dist. No. 309 v. Grand Stage Lighting Co.*, 235 Ill. App. 3d 756, 762, 601 N.E.2d 972, 976 (3d Dist. 1992); *see also Branigar v. Village of Riverdale*, 396 Ill. 534, 546, 72 N.E.2d 201, 207 (1947). Only where the subject of the contract is itself *ultra vires* under municipal powers will courts find the contract void *ab initio* and unenforceable. *Ad-Ex, Inc. v. City of Chicago*, 207 Ill. App. 3d 163, 172, 565 N.E.2d 669, 675 (1st Dist. 1990).

Here, though the Village did not pass the Lyon-Village transaction by ordinance, it was passed by a unanimous resolution, and the text of the agreement was published. (Illinois Paper SOF ¶ 9.) The fact that the approval mechanism was a resolution rather than an ordinance was, at most, a procedural irregularity which did not deprive any objectors of due process. *Cf. Ad-Ex, Inc.*, 207 Ill. App. 3d at 174, 565 N.E.2d at 677 (city's agreement to re-zone property pursuant to settlement agreement was *ultra vires* because hearing requirement was jurisdictional, in that it was necessary to satisfy due process). Instead, the facts are similar to that in *Humphrey's Property Group,* where a municipality amended an agreement through an agent, rather than by ordinance, though the statute authorizing the agreement and the agreement itself called for adoption by ordinance. *See* 925 N.E.2d at 224. The appellate court,

answering a certified question, held that estoppel could supersede both the statutory and contractual ordinance requirement, rendering the amendment enforceable against the municipality if the estoppel requirements were met. *Id.*

The estoppel requirements are met here. The Village took an official act to induce Lyon to enter into an agreement with it. Lyon detrimentally relied on the agreement by providing copier equipment to the Village, and the Village received the benefits of the equipment for nearly the entire valuable life of the equipment while living up to only a fraction of its contractual obligation. The Village—and Lyon, by extension—is estopped from claiming that the Village's failure to pass an ordinance renders the contract void where it has already consumed much of the benefit of the contract. The cases that find a municipality should not be held to a contract, and there was no estoppel, involved specific officials who acted beyond the scope of their authority to authorize certain work, thus meaning that there was no official municipal act. *Patrick Eng'g, Inc.*, 2012 IL 113148 at ¶ 41, 976 N.E.2d at 332 (plaintiff failed to allege that city officials had authority to bind city to contractual changes); *Bank of Pawnee*, 166 Ill. App. 3d at 939, 521 N.E.2d at 1185 ("Nothing in the record indicates the village clerk or manager were ever granted authority to enter into an undisclosed agency agreement with a third party."); *Nielsen-Massey Vanillas, Inc. v. City of Waukegan*, 276 Ill. App. 3d 146, 156, 657 N.E.2d 1201, 1209 (2d Dist. 1995) (city agents did not have authority "to grant loans outside of existing programs").[6]

The more difficult question is whether the Lease Agreement contains an interest rate that exceeds the authority granted by § 5/11-61-3. The court finds that it does. The parties agree that the cost of the equipment when Lyon purchased it from Illinois Paper was $510,658.19. (Illinois Paper Resp. to Lyon SOF ¶ 3.) The Village then agreed to purchase the

---

[6]     The Village also notes that the resolution approving the contract erroneously identifies Illinois Paper as the lessor (Village Reply Br. 14), but the court finds that the Village is still estopped from using this "irregular exercise" of power to avoid further performance on the contract it received benefits for and paid on for 19 months with Lyon. *Cf. Humphrey Prop. Grp.* at 224.

equipment from Lyon with 72 monthly payments of $9,500.00, (*id.* at ¶ 4), for a total of $684,000. Lyon contends that these payments equate to a 10.153% rate. (Lyon SOF ¶ 5.) Illinois Paper does not dispute that if the entire difference between the price paid by Lyon and the total Lease Agreement price is interest, this calculation is correct. (*See* Illinois Paper Br. 20.)

Illinois Paper denies, however, that the difference between what Lyon paid and what the Village paid should be called "interest" at all. For this position, Illinois Paper cites a number of cases holding that the Illinois usury statute does not apply to sales, therefore, there can be no "interest" on sales. *See, e.g., Computer Sales Corp. v. Rousonelos Farms, Inc.*, 190 Ill. App. 3d 388, 391–92, 546 N.E.2d 761, 763–64 (1st Dist. 1989) (collecting cases); *Johnson v. Sears Roebuck & Co.*, 14 Ill. App. 3d 838, 852 (1st Dist. 1973). But these holdings do not establish that there can be no interest in a sales agreement; in fact, one of them explicitly refers to the profits on an installment sales agreement as interest. *Computer Sales Corp.*, 190 Ill. App. 3d at 392, 546 N.E.2d at 763–64 ("Thus, if the transaction involves a sale rather than a loan, it is not subject to the limitation on interest. The parties to the contract could agree that defendant would pay interest at a rate higher than the maximum rate provided in the usury statute."). These cases only stand for the proposition that the Illinois usury statute is agnostic as to sales contracts, and do not support the argument that § 5/11-61-3 is as well. Further undermining Illinois Paper's position, 65 ILCS § 5/11-61-3 explicitly considers "purchase[s] . . . paid through installments . . ." and creates the interest requirement in the same sentence. 65 ILCS § 5/11-61-3.

The court's duty in interpreting a statute is to "give effect to the legislature's intent, best indicated by the plain and ordinary meaning of the statutory language." *People v. Garcia*, 241 Ill. 2d 416, 421, 948 N.E.2d 32, 35 (2011) (citing *People v. Tidwell*, 236 Ill. 2d 150, 157, 923 N.E.2d 725, 732 (2010). The court "may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute

one way or another." *Bowman v. Ottney*, 2015 IL 119000, ¶ 9, 48 N.E.3d 1080, 1083, *reh'g denied* (Jan. 19, 2016) (citing *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of the City of Chicago*, 2012 IL 112566, ¶ 15, 963 N.E.2d 918, 923) (construing purpose of statute permitting a one-time substitution of judge).

The court will not construe § 5/11-61-3 to render the interest limitation meaningless as to sales. The statute specifically contemplates the cost of interest in an installment sale or lease: the statute allows the purchase or lease of personal property paid through installments, but limits the rate of interest to be paid on such a contract to the amount set in the Bond Authorization Act. 65 ILCS § 5/11-61-3. If parties could evade the statutory cap simply by leaving the interest rate unstated, the cap would have no effect. Interpreted this way, interest must be the premium over the purchase price paid over time, by whatever name. Furthermore, Lyon and the Village should not be able to moot the interest requirement by identifying Lyon as a seller, rather than a lender. The fact that Lyon is nominally the seller does not make the agreement any less of a financed transaction.

Illinois Paper challenges the conclusion that the difference between the amounts paid by Lyon to Illinois Paper and the amounts Lyon stood to earn must all be characterized as interest, rather than some other form of profit. In the court's view, this interpretation is necessary in order for the interest cap to have any meaning. Interpreting it in some other way would allow parties to ignore it by recategorizing some portion of the profits on an installment sale to be non-interest. Illinois Paper suggests that the Internal Revenue Service imputed interest rate may be used for this purpose when there is no stated interest, here, 3.14%. (Paper Stmt. of Additional Facts [253 at p. 19], at ¶ 4; Decl. of Patrick O'Malley, Ex. 1 to Illinois Paper Reply Br. [254-1], at 1.) The court rejects this proposal for the same reason; the court will not assume that the legislature intended to allow parties to these transactions to decide on their own what is interest and what is principal, thus rendering the interest limitation toothless.

Having concluded that the interest in this transaction exceeds the statutory amount, the court must determine the appropriate resolution. On this question, too, the parties disagree. Lyon advocates that the contract is void *ab initio* and unenforceable. Illinois Paper responds that the agreement is enforceable in part, and that the damages for breach should include all payments other than the excessive interest. (Illinois Paper Reply Br. 23).[7] A full release of the contractual obligation would be a windfall, Illinois Paper contends; the Village made only 19 payments on the 72-month lease and used up nearly the entire valuable life of the equipment. (Lyon SOF ¶ 6; Illinois Paper SOF ¶ 11 (Village exhausted 95% of the value of the equipment and then ceased making payments).)

Even where estoppel otherwise would apply, courts cannot enforce an agreement made by a municipality that is "expressly prohibited by law," because such contracts are void *ab initio*. *Diversified Computer Servs., Inc. v. Town of York*, 104 Ill. App. 3d 852, 857–58, 433 N.E.2d 726, 731 (2d Dist. 1982). In that case, the appellate court reversed a judgment in favor of plaintiff for breach of a five-year contract for the purchase of computer services because the defendant town's failure to appropriate funds for the contract, as required by a state statute, rendered the contract unenforceable. *See also Ad-Ex, Inc.*, 207 Ill. App. 3d at 174, 565 N.E.2d at 677 (city's agreement to re-zone property without hearing violated condition precedent, as hearing requirement was necessary to satisfy due process).

On the other hand, municipalities may be estopped from avoiding a contract where the subject of the contract is not beyond municipal powers:

> [T]here is another class of municipal contracts, distinct from the void type heretofore referred to, wherein the municipality has the power to enter into the contract, but where a portion thereof may be beyond its power, or its power may have been irregularly exercised. As to this class of contracts, a municipality may not assert its want of authority or power, or the irregular exercise thereof, where to do so would give it an unconscionable advantage over the other party.

---

[7] Lyon and the Village both had an opportunity to respond to this argument but did not. Lyon Reply Br. [262]; Village Reply Br. [268].

*Stahelin v. Bd. of Ed., Sch. Dist. No. 4*, 87 Ill. App. 2d 28, 42, 230 N.E.2d 465, 472 (2d Dist. 1967). The appellate court in that case affirmed the trial court's determination that defendant school board was estopped from refusing to pay a contractor for extra work performed at the direction of individual board members rather than the board as whole. 87 Ill. App. 2d at 32–33, 42, 230 N.E.2d at 467–68, 472. The relevant statute required that all expenditures by a school board be approved at a meeting. *Id.* at 34, 230 N.E.2d at 468. Noting that the school district had the "general power to contract as it did," including for "extras" added to a construction project, the court concluded that the contract was not *ultra vires* simply because the district had not followed the statute requiring full board approval. *Id.* at 42, 230 N.E.2d at 472. Instead, the district was estopped from refusing to pay, because it had permitted the contractor to perform the extra work and had accepted the benefits of that work. *Id.*; *see also Mahoney Grease Serv.*, 85 Ill. App. 3d at 582, 406 N.E.2d at 914 (holding that city attorney's promise, in an oral settlement agreement, for city to annex and re-zone land was "within the legal authority of the city of Joliet to accomplish," and were "not absolutely void acts per se," therefore city could be estopped from avoiding enforcement of contract).

No Illinois case has directly considered the question before the court: where a municipality had authority to enter into the subject matter of the contract, but exceeded its statutory authority in the terms of the agreement, may the contract be enforced to the extent of the municipality's authority? Though a recent, unpublished decision of the Illinois Appellate Court held that a water contract which extended beyond the allowable forty-year term was *ultra vires*, it declined to consider the possibility that the contract should be enforced up to statutory cap because the plaintiff had failed to raise the argument. *City of Virginia v. Village of Chandlerville*, 2014 IL App (4th) 130851-U, ¶ 35.

Cases in the usury context are instructive here. The victim of a usurious interest rate is properly held to a legal interest rate; that result rights the wrong without giving the victim an undue windfall. *Franklin Cty. Bldg. Ass'n v. Cravens*, 285 Ill. App. 415, 2 N.E.2d 122 (4th Dist.

1936); *see also Spain v. Hamilton's Adm'r*, 68 U.S. 604, 624 (1863) ("[T]he complainant, as a suitor in equity, could only have relief for the excess over the real debt . . . ."); *De Korwin v. First Nat. Bank of Chicago*, 275 F.2d 755, 762–63 (7th Cir. 1960) (court justified in treating usurious loan as a "loan[] at legal interest" under New York law). In *Franklin*, a buyer took out a mortgage at a usurious rate of interest from a building association to buy a condominium. 285 Ill. App. at 417, 2 N.E.2d at 123. When the building association attempted to foreclose after nonpayment, the trial court entered the judgment of foreclosure but ordered that the entire interest obligation was unenforceable. *See id.* at 420, 2 N.E.2d at 124. The appellate court reversed that portion of the order, finding that "one who sought relief from a court of equity from a usurious contract was compelled to do equity, to pay the legal rate of interest." *Id.* at 422, 2 N.E.2d at 125; *see Spain*, 69 U.S. at 624. This situation is no different; the Village (and Lyon) have claimed that the agreement is unenforceable, but there is no reason the Village would be excused from liability for the entire interest obligation if it otherwise had the power to enter into it. *Cf. Mahoney Grease Serv.*, 85 Ill. App. 3d at 582, 406 N.E.2d at 914 (annexing and re-zoning land "not absolutely void acts per se."). No party claims that § 5/11-61-3 would not allow the purchase at issue (the installment purchase of copiers), and the Village would have had authority to enter into the contract at 9% interest. Therefore, the Village is estopped from denying the contract up to that legal rate of interest. *See also McCormick v. Indep. Life & Annuity Co.*, 794 F.3d 817, 819 (7th Cir. 2015) ("Cancellation of the principal debt would be a windfall, not a means of vindicating the McCormicks' contractual rights.") (applying Wisconsin law); *De Korwin*, 275 F.2d at 762–63.

Illinois Paper, then, is obligated under the guarantee for the portion of the interest that is unenforceable, a total of $21,248.64.[8] The contract would be enforceable against the Village as

---

[8] Over the same term, at an enforceable 9% rate of interest, the Village would have paid $9,204.88 per month for a total of $662,751.36. The contract under the Lease Agreement provided a total of $684,000 to Lyon; this is the difference.

to the principal obligation and the enforceable 9% interest on the sale, reduced by the nineteen payments already made. The court proposes these amounts to avoid further briefing in this matter, but invites the parties to file a necessary motion if they have a sound basis to object to these calculations.

### III. The Village's request that the court reconsider its previous order on the statute of limitations is granted; Lyon's claim against the Village is time-barred.

In its previous order on summary judgment, the court concluded that the Village waived its right to raise the statute of limitations as a defense to Lyon's breach of contract claim. *Lyon Fin. Servs., Inc.*, 2016 WL 147654, at *17–18. The Village asks the court to reconsider that ruling (Village Br. 2–3), particularly, the Village takes issue with the court's conclusion that Lyon suffered prejudice by the Village's delay. *Lyon Fin. Servs., Inc.*, 2016 WL 147654, at *18. Generally, "[t]he failure to plead an affirmative defense in the answer works a forfeiture only if the plaintiff is harmed by the defendant's delay in asserting it." *Garofalo v. Village of Hazel Crest*, 754 F.3d 428, 436 (7th Cir. 2014) (quoting *Matthews v. Wis. Energy Corp., Inc.*, 642 F.3d 565, 570 (7th Cir. 2011)).

The Village, which explicitly disclaimed reliance on the statute of limitations, has now reversed course. But apart from frustration, Lyon has not demonstrated it has suffered any prejudice as a result of the delay in asserting this defense. At this point, the court is persuaded that Lyon has had a reasonable opportunity to make that demonstration. Cases where statute of limitations defenses are appropriately waived involve circumstances where the opponent has not had an opportunity to respond. In *Venters v. City of Delphi*, the court reversed the district court's order that a statute of limitations defense was waived, finding that the plaintiff suffered prejudice when the defense was not raised until a reply brief at the summary judgment stage, a month before trial, and the trial court refused to allow a surreply. 123 F.3d 956, 968 (7th Cir. 1997); *see also In re Kontrick*, 295 F.3d 724, 735 (7th Cir. 2002) (party waived timeliness

defense by failing to raise it until after summary judgment was granted against him). In contrast, waiver is inappropriate where the opposing party has the opportunity to substantively respond to the defense. *See Garofalo*, 754 F.3d at 437 (no prejudice where opposing party had opportunity to respond in summary judgment response brief); *see also Carter v. United States*, 333 F.3d 791, 796–97 (7th Cir. 2003) (finding no waiver of affirmative defense where no substantive effect on plaintiff's response). Because Lyon had the opportunity to—and did— thoroughly argue against the application of the statute of limitations defense in this round of briefing (Lyon Resp. to Village 2d Mot. for Summ. J. [257]), as well as in its request to deny the Village the opportunity to amend its motion for summary judgment (Lyon Mot. to Reconsider Grant of Village Mot. for Leave to Amend. [158]), and in the first round of summary judgment briefing (Lyon Resp. to Village Am. Mot. for Summ. J. [172], at 3–8), the court finds that Lyon has not suffered prejudice in its ability to substantively respond to the defense. Therefore, the Village may assert the defense.

Lyon also argues that the Village should be equitably estopped from raising the statute of limitations, and that the statute should have been equitably tolled while the appeal was pending. But equity militates against Lyon on this issue, as it not only delayed in filing the claim, but agreed with the Village's interpretation of the transaction's enforceability by failing to sue the Village when it initiated litigation to enforce the agreement. It actively asserted the Village's position that the Lease Agreement was unenforceable by filing suit solely against Illinois Paper. Lyon did sleep on its rights—either because it took the Village at its word that the "lease" was unenforceable or because it failed to suspect that the agreement could be enforceable under the web of legal doctrines examined above. Neither of these circumstances can be blamed on Lyon's adversaries.

Because the Lease Agreement is, in effect, a sale of goods, the four-year statute of limitations on a contract for sale under the UCC applies. 810 ILCS 5/2-725. The breach

occurred, at the latest, on August 27, 2010, when the Village failed to make a payment.[9] Lyon did not file suit against the Village until December 12, 2014. (*See* Am. Compl. [114], at ¶ 3.) Accordingly, the statute of limitations bars Lyon's claim against the Village.

## IV.    The court is not prepared to award attorneys' fees.

Lyon requests that it be awarded its attorneys' fees from whichever party it prevails against. (Lyon Br. 24–25.) The Lease Agreement provides for an award of fees in the event of a breach (Addendum to Lease Agreement [219-1], at 2), while the Partnership Agreement only contains an indemnification provision: "[Illinois Paper] agree[s] to indemnify and hold harmless from any loss or claim resulting from [Illinois Paper's] breach of the foregoing representations and warranties." (Partnership Agreement.) If Lyon may recover fees in this situation, the court will award reasonable fees, "consisting of reasonable charges for reasonable services." *McHenry Sav. Bank v. Autoworks of Wauconda, Inc.*, 399 Ill. App. 3d 104, 113, 924 N.E.2d 1197, 1206 (2d Dist. 2010) (citing *Mountbatten Sur. Co. v. Szabo Contracting, Inc.*, 349 Ill. App. 3d 857, 873, 812 N.E.2d 90, 104 (2d Dist. 2004)). However, a party may collect fees only on the claims on which it has prevailed. *First State Bank of Round Lake v. Busse*, 126 Ill. App. 3d 577, 581, 467 N.E.2d 1061, 1064 (1st Dist. 1984).

The court must request additional briefing from Lyon and Illinois Paper, based on the foregoing, as to (1) whether Lyon may recover attorneys' fees under the Partnership Agreement, and (2) what fees are reasonable.

---

[9]      The breach likely occurred on or about June 1, 2010, when the Village's counsel informed Lyon's counsel via letter that the Village would make no further payments. (Village SOF ¶ 19). Where one party to a contract unconditionally repudiates the contract, "either by words or acts, which is communicated to the other party prior to the time fixed for his performance," the breach occurs at the time of the communication. *Dyrdal v. Golden Nuggets, Inc.*, 689 N.W.2d 779, 785 n.4 (Minn. 2004) (quoting *In re Haugen*, 278 N.W.2d 75, 79 n.6 (Minn. 1979)). The Village's written communication is unequivocal that the Lease Agreement is unenforceable and that the Village's "last payment for the use of the equipment . . . will be July 2010 . . . ." (Letter from Sean Conway to Troy Kepler (Jun. 1, 2010), Ex. B. to Village SOF [237-1 at p.17].) The specific date of the breach is not before the court, however, as even if the breach occurred at the time the Village failed to make the August 2010 payment, the statute of limitations would bar the claim.

## CONCLUSION

The Village's motion for summary judgment [237] is granted.  The Village's memorandum of law [239], erroneously docketed as a motion, is terminated as a motion. Lyon's motion for summary judgment [242] is granted in part and denied in part: summary judgment is granted against Illinois Paper in the amount of $21,248.64, the interest over the statutory cap.  Illinois Paper's motion for summary judgment [231] is also granted in part and denied in part; the Lease Agreement is enforceable, but only up to the statutory interest cap. Lyon's motion to strike the declaration of Patrick O'Malley [266] is stricken as moot.

Status hearing is set for April 12, 2017, at 9:00 a.m.  The parties are again urged to attempt to settle the remaining issues.


ENTER:


Dated: March 23, 2017                    _____
                                         REBECCA R. PALLMEYER
                                         United States District Judge